STATE, RESPONDENT, v. SUITOR, APPELLANT.

(No. 2,956.)

(Submitted February 4, 1911. Decided February 25, 1911.)|

[114 Pac. 112.]

*Criminal Law—Homicide—Circumstantial Evidence—Insufficiency—Admissions—Motive.*

Criminal Law—Circumstantial Evidence—Conviction—Nature of Evidence Required.

1. Where a conviction is sought upon circumstantial evidence, all the circumstances proved must be consistent with each other and with the hypothesis that the accused is guilty, and at the same time inconsistent with any other rational hypothesis.

Same—Motive—Significance of Evidence.

2. While it is not indispensable that motive be shown before conviction for homicide can follow, if the facts otherwise tend to show the commission of the crime, its presence or absence is significant in the light of the facts of the particular case.

Same—Admissions of Guilt—What are not.

3. A statement made by defendant, after he had been informed of the evidence which had been gathered against him, that he expected to be arrested upon a charge of murdering deceased, and one made to the sheriff at the time of his arrest, that he thought the officer was looking for him, and doubting that the authorities had much evidence against him, *held* not to have been implied admissions of guilt under the circumstances of the case.

Same—Murder—Conviction—Circumstantial Evidence—Insufficiency.

4. *Held,* that the circumstantial evidence upon which defendant was convicted of murder in the first degree did not exclude the hypothesis of his innocence, but only went so far as to induce the conclusion that he was probably guilty, and therefore was insufficient to justify a conviction.

*Appeal from District Court, Fergus County; E. K. Cheadle, Judge.*

STEPHEN E. SUITOR was convicted of murder in the first degree, and appeals from the judgment and an order denying his motion for a new trial.

*Mr. John A. Coleman* submitted a brief in behalf of Appellant and argued the cause orally.

The verdict is contrary to law. It fails to find the degree of crime of which the defendant was found guilty, and failure

to designate the degree of crime vitiates the verdict, and no judgment could be legally rendered thereon. (*Territory* v. *Stears*, 2 Mont. 324; *People* v. *Marquis*, 15 Cal. 38; *People* v. *Campbell*, 40 Cal. 129; *People* v. *O'Neil*, 78 Cal. 388, 20 Pac. 705; *Kearney* v. *People*, 11 Colo. 258, 17 Pac. 782; *State* v. *Rover*, 10 Nev. 388, 21 Am. Rep. 745; *State* v. *Moran*, 7 Iowa, 236; *State* v. *Jackson*, 99 Mo. 60, 12 S. W. 367; *Tully* v. *People*, 6 Mich. 273; 21 Cyc. 1084.);

In behalf of the State, *Mr. Albert J. Galen*, Attorney General, and *Mr. J. A. Poore*, Assistant Attorney General, submitted a brief. *Mr. Poore* and *Mr. J. C. Huntoon*, who prosecuted defendant in the district court, argued the cause orally.

The object the legislature had in mind in enacting section 9324, Revised Codes, requiring the jury to find the degree of the crime of which they find accused guilty, whenever the crime is distinguished into degrees, evidently was to guard and protect the rights of the defendant, so that the court in inflicting the punishment might be advised of the exact degree of the crime of which he was convicted. (*People* v. *Rugg*, 98 N. Y. 551.) This being the object and purpose of the statute, if the verdict is so worded that the court can determine therefrom what it means, then the statute is complied with, even though it does not in so many words state the degree of the crime of which they find the defendant guilty. If the indictment is so drawn as plainly to show the degree of the crime charged, all the jury need do is to find the prisoner guilty in manner and form as he stands indicted, under statutes similar to our own requiring the jury to find the degree of the crime by their verdict. (*Commonwealth* v. *Flanagan*, 7 Watts & S. (Pa.) 418; *White* v. *Commonwealth*, 6 Binn. (Pa.) 183, 6 Am. Dec. 443; *Commonwealth* v. *Earle*, 1 Whart. (Pa.) 530; *Leschi* v. *Washington*, 1 Wash. Ter. 13.) Where the indictment charges defendant with murder in the first degree, and the verdict finds him "guilty in manner and form as he stands charged," the verdict sufficiently designates the degree. (*Kennedy* v. *State*, 6 Ind. 485; see, also, *State* v.

*Weese,* 53 Iowa, 92, 4 N. W. 827, decided under a statute practically the same as section 9324, *supra; State* v. *Gilchrist,* 113 N. C. 673, 8 S. E. 319; *People* v. *Rugg,* 98 N. Y. 551; *Hays* v. *Commonwealth,* 12 Ky. Law Rep. 611, 14 S. W. 833; *Fitzgerald* v. *People,* 37 N. Y. 420; *Kennedy* v. *People,* 39 N. Y. 250; *Bilansky* v. *State,* 3 Minn. 437.)

Every reasonable intendment will be made in favor of a verdict. (*Rose* v. *State,* 82 Ind. 346.) While verdicts in criminal cases should be certain and import a definite meaning, free from ambiguity, yet they should be considered with reference to the indictment and the entire record, and any words which convey beyond a reasonable doubt the meaning and intention of the jury are sufficient, and all fair intendments will be made to support the verdict. (*Albritton* v. *State,* 54 Fla. 6, 44 South. 745; *O'Neal* v. *State,* 54 Fla. 96, 44 South. 940; *Edwards* v. *State,* 54 Fla. 40, 45 South. 21; *Pugh* v. *State,* 55 Fla. 150, 45 South. 1023; 12 Cyc. 690, note.) A verdict which fails to specify the degree of murder of which the defendant is found guilty is not void. (*State* v. *Jennings,* 24 Kan. 650.) Where the jury find the defendant guilty in "manner and form as indicted," and the wording of the indictment applies as well to second as first degree murder, the court should enter judgment for the second degree. (*Johnson* v. *Commonwealth,* 24 Pa. 390; *Garvey* v. *People,* 6 Colo. 559, 45 Am. Rep. 531.)

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

The defendant was convicted of murder in the first degree and sentenced to undergo punishment by confinement in the state prison for life. He has appealed from the judgment and an order denying him a new trial. Two contentions are made in his behalf, *viz.:* That the evidence is insufficient to justify the verdict, and that the verdict is contrary to law.

The evidence is entirely circumstantial. The defendant at the time of the homicide was residing alone in a cabin a few miles northeast of the village of Giltedge, in Fergus county. He was

the owner of cattle which ranged over the mountains to the north and west. The Spotted Horse and Cumberland mines are about two miles to the northwest of defendant's home. The village of Maiden is to the west and some distance farther, so that its position with reference to Giltedge is northwest, and with reference to these mines southwest. The road from Giltedge to Maiden winds for a distance to the northwest through Maiden canyon, and then turns west. From this point a branch road leads northward up the canyon to the Spotted Horse mine, thence to the Cumberland, half a mile farther, and thence north over a low divide connecting with another road coming from the northeast, called the Ft. Maginnis road. On the right to one going up the canyon, about 700 feet directly east from the point where the road turns west to Maiden, and about 250 feet above the level of the road, in an open park, is situated the Hertford quartz claim, belonging to one Mellor. The ascent in that direction is precipitous and covered with timber. A person at work on the claim cannot be seen by one passing along the canyon nearer than from a point about 2,500 feet in the direction of Giltedge. The deceased, Thomas Burke, was a miner, and occupied alone a cabin in the canyon near the road leading to the Spotted Horse mine. The cabin is on a direct line between the mine boarding-house and the Hertford claim, about 700 feet from the former and 1,000 from the latter. The Cumberland boarding-house is several hundred feet to the northwest beyond the Spotted Horse boarding-house. The Hertford claim is not visible from any of these points. From it the surface of the country first ascends rapidly for somewhat more than a mile to the northeast and east, and then gradually descends to the level of the Ft. Maginnis road on the north and toward the home of the defendant to the east. It is rough and precipitous, so that in order to conveniently reach the Hertford claim from the home of defendant, either on foot or horseback, it is necessary to travel three or four miles around the base of the mountain toward the south and approach it by the road from Giltedge, or to go northward to the Ft. Maginnis road and come into Maiden canyon from the north over the divide, traveling about the same distance. One

witness stated that the claim might be reached from defendant's place by going directly across the mountain on horseback.

This brief description of the locality where the homicide occurred and the surroundings is necessary to an understanding of the evidence, of which the following is a summary:

On June 28, 1910, Thomas Burke was in the employ of Mellor, and engaged in doing discovery work on the Hertford claim. Its location seems not to have been completed. He was seen to leave his cabin with his lunch bucket about 8 o'clock in the morning, taking the trail along the eastern wall of the canyon leading up to the claim. This was the last time he was seen alive by any witness. About 11 o'clock in the forenoon he fired a blast, the report of which was heard by several witnesses at the Spotted Horse and Cumberland mines. About 3 o'clock in the afternoon another report was heard in the direction of the claim, which, in the opinion of these witnesses, was made by the discharge of a shotgun. Mellor was in the employ of the Cumberland Mining Company. He went to the cabin of Burke on the evening of the 28th, but found no one there. He returned the following evening, and, finding no one there, wrote a note to deceased and left it for him. Later the same evening he again returned, and, finding that the deceased was still absent, went to the claim in search of him, thinking he might have been injured. On arriving there in the dusk, he found the body of the deceased lying face downward in an open cut in which he had been at work. He at once notified the sheriff and coroner. An examination made of the body the next morning revealed the fact that the deceased had been killed by a discharge of what appeared to be six buckshot, fired into his breast from the right and somewhat above and from a short distance, and that they all entered within a space of three inches square, tearing his heart into shreds. The nature of the wound and the position of the body indicated that he had probably been called by the assassin and shot down as he turned to answer. There was no evidence of a struggle. The lunch bucket was found empty. The surroundings indicated that the deceased had fired a blast, and that at the time he was killed he was engaged in shoveling the debris out upon the lips of the

cut. Leading from the cut to a small tree below and toward the road were found the tracks of a man, and below the tree along the slope was the track of a small horse, which in the opinion of a witness was not very old, though he did not notice it closely enough to determine whether it was old or new. These led down toward the road in the canyon. On the 1st or 2d of July a deputy sheriff examined the ground in the vicinity. In a small park hidden in the timber across the road in the canyon he found a faint trail in the grass which appeared to have been made by someone going in and returning. On the left lip of the cut and toward the face of it there was picked up an ordinary twelve-gauge felt shotgun wad. This bore on one side the marks of buckshot. A day or two afterward a twelve-gauge cardboard shotgun wad was found in the loose dirt in the cut. It was of a pink or yellow color on one side and white on the other. It was shown that in addition to felt wads a wad similar in color and material is used by the manufacturer in loading what is known to sportsmen and the trade as "Peter's Ideal shells." It is placed over the shot. The pink or yellow color is the same as that of the outside covering of a Peter's Ideal shell, no other manufacturer using it. On one side of 'the wad found were marks of small shot. Five shots were taken from the body, and upon examination some of them appeared to have been whittled down to make them chamber in a twelve-gauge shell.

The defendant was arrested upon a charge of murder on July 6. At his house was found, among his other weapons, a twelve-gauge double-barreled shotgun. The firing apparatus of the right barrel was out of repair. In the opinion of witnesses who examined it then, the left barrel had been recently fired, and streaks along the bore indicated that the last charge fired from it had consisted of buckshot or other large shot. Scattered about the premises outside the cabin were found several exploded Peter's Ideal shells, all twelve-gauge in size. The following conversation occurred between him and the sheriff at the time of his arrest: "Q. You were here the other day, wasn't you? A. No; I was over this way, but I was not here. Q. I heard you were here. I thought you were looking for me. I guess they

. haven't got much evidence against me, have they?" Questioned as to his whereabouts on June 28, he did not give a definite answer. He remarked that he had heard someone telling that he had been at Giltedge trying to buy buckshot. On the evening of June 14 he was at Lewistown in company with the witness Langdoc. The two went to a restaurant to eat. On the way the defendant asked the witness if he could shoot coyotes with buckshot. The witness replied: "Yes; if you are close enough." Defendant then said: "Well, I believe I will go to the hardware [store] and get some." The witness stated that defendant then started toward the Judith Hardware Company's store, but found the door locked. The next day a man called at the store and purchased two pounds of buckshot of different sizes mixed. The identification of this man as the defendant rests upon the testimony of the salesman, which is as follows: "Q. Ask you to state whether or not it was to him [defendant] the sale was made. A. I cannot say definitely. Q. Well, say to the best of your judgment. A. Why, to the best of my judgment it is the gentleman. Q. And where did you next see the gentleman to whom you sold the shot? A. At the time I came with the sheriff up to his residence." At another place in his testimony he stated that he had described the purchaser of the shot to the sheriff, and that his description "tallied very good with Mr. Suitor. * * * Well, he struck me as being a peculiar appearing and a typical western man." He could not describe the defendant's clothing further than to say that the hat he had on at that time seemed the same he had when arrested, "rather a western style of hat." This witness had accompanied the sheriff at the time the arrest was made. At the preliminary hearing he had testified that he recognized the defendant by his beard, his movements, and his voice. This was the only witness, other than Langdoc, who testified concerning the purchase of the buckshot, or who spoke as to the identity of the defendant as the purchaser. The evidence is not definite as to what sizes were included in the lot, but it appears that there were probably some of sizes Nos. 3, 4, and 5, and perhaps 6. Nos. 5 and 6 chamber in a twelve-gauge shell, but No. 4 will not. Three of the shot taken from the body of de-

ceased weighed less than either No. 4, 5, or 6, and are referred to by one witness as Nos. 2, 3, and 4. A fourth weighed considerably heavier than any of the sizes mentioned. On the day of defendant's arrest and afterward on two different occasions, his house and premises were searched minutely. Besides the exploded shells already mentioned others were found scattered about. All bore evidence of having been exploded some time before. Among the ashes in the cooking stove, which was apparently also used for heating purposes, there was found the brass butt of a Peter's Ideal shell which had been burned. That it had been exploded was apparent from the condition of the fuse. The point of the left firing-pin of defendant's gun, either because of the shape of it or because it did not strike true, marked the fuse of a shell exploded by it at one side. Many of the shells found, including the one burned, bore this mark. There were found on a shelf near the stove a twelve-gauge gun wad and two paper wad covers. No buckshot were found nor any loaded shotgun shells, though there were cartridges for the other weapons—two rifles and an automatic pistol. Defendant usually wore a black hat. At about 11:30 on the morning of June 28 the same witness who had seen the deceased leave his cabin for work observed a man following the trail taken by deceased toward the Hertford claim. He wore a black hat, but no coat. His shirt was of a light color. The witness could not recognize him. He was carrying something which witness thought was a gun. In traveling over the range to look after his cattle, the defendant would sometimes go on horseback, but frequently walked. The horse he rode was of a dark color and traveled slowly. About 4 o'clock in the afternoon of June 28 a man dressed in dark clothes and hat was observed at the mouth of Maiden canyon on a dark horse proceeding along the road from the direction of Maiden in the general direction of the cabin of defendant. The road he was traveling turns east out of the road leading from Maiden to Giltedge through a deserted ranch, and theretofore had generally been used by defendant to reach his cabin from the direction of Maiden, though it was sometimes traveled by others, both on foot and on horseback. This witness was about 2,000 feet

from the horseman. He did not undertake to identify him, nor did he observe where he went. The deceased was the owner of some mining claims to the north or northwest of defendant's place, in or near what is called "Collar Gulch." In order to reach them, he would go from his cabin northward over the divide, and thence eastward in the direction in which the Ft. Maginnis road leads. On June 27 the defendant was seen by a witness named McIntyre hurrying on foot from the direction of Collar Gulch toward his home. When he saw the witness approaching him, according to the statement of the witness, he got off the road into the brush. He was carrying a shotgun. The same witness stated that he had seen defendant frequently there before that day. He also saw him on horseback near the same place afterward but he then had no weapon. In September, 1909, the defendant procured the arrest of deceased in peace proceedings. The deceased could not furnish bond, and was detained in jail thereafter in default of bond, until March 7, 1910, when he was released. The nature of the difficulty between the defendant and deceased does not appear. On June 10, 1910, the defendant had a conversation with a witness near Giltedge. He inquired of witness whether the deceased had been trying to obtain from the sheriff some hounds, and why he wanted them. The witness replied that the deceased was afraid of defendant, and wanted the hounds to protect him at night. Defendant then said: "The d—— fool. If I wanted him, I could get him without going to the cabin." He also remarked that the deceased was getting crazy because he himself had had a conversation with him, and that he had said that he would not fight because he was under bonds, but that when the time was up he would settle with defendant. On June 29, in a saloon at Giltedge, he invited several persons present there to drink, remarking: "Well, come on boys. Might as well have a drink. I have only got sixty days more to live, and Burke is going to kill me." He stated to a witness at Giltedge a day or two afterward that he expected to be arrested upon a charge of murdering deceased, the witness having told him about the evidence which had been gathered against him. Several witnesses testified that the recoil

of a shotgun upon a discharge of buckshot is much greater than from a discharge of small shot, resulting frequently in a bruise upon the muscles of the arm and shoulder. On July 11 the person of defendant was examined by the sheriff at the jail in Lewistown. A discoloration like a healing bruise was found on the muscle of his right shoulder. Defendant was in the habit of shooting from his right shoulder. On July 7 the defendant's saddle-horse was examined by the sheriff and others. His legs were chafed and sore. In the opinion of one witness this condition was due to his "fighting hobbles," which the defendant had put upon him some two or three weeks before.

The foregoing is gathered from the statements of witnesses introduced by the state. The defendant offered himself as a witness. He did not controvert seriously any statement of fact made by any witness, except that he denied that he had made any inquiry about buckshot or had purchased any at the time or place mentioned by any of them, or elsewhere, and also that there was any mark or bruise upon his shoulder. He admitted that he had purchased buckshot, but not within two or three years. He admitted, or did not deny, the conversations had with several witnesses about the deceased and also with the sheriff at the time of his arrest. He offered the explanation, however, that he had heard he was suspected of the murder because of the strained relations existing between him and the deceased. He stated that he was present at his home during the whole day of June 28, engaged in making preparations for hay harvest, explaining that he did not give the sheriff a definite answer at the time of his arrest by saying that he did not then remember his whereabouts, but that, after thinking over the matter, he had become satisfied that he had not left his place on that day, stating particularly what he was doing. It appears from his own testimony and that of other witnesses examined in his behalf, and upon this point there is no controversy, that he was in the habit almost daily of looking over the range for his cattle which ranged mainly to the north of Maiden and the Spotted Horse and Cumberland mines, and that it was not an unusual thing for him to walk. He usually carried a gun of some sort to shoot coyotes,

which killed many of his calves. He stated that he preferred to walk because it hurt him to ride. Touching the shells found about the cabin, he stated that he had had no loaded shells for some time; that he knew nothing about the remnant of the shell found in the stove; that he sometimes changed shot in shells from smaller to a larger size; that he would pick up and preserve for use in this connection wads when he found them dropped about the place as he fired his gun from time to time, but that he did not reload any shells. He explains the presence of the remnant of the shell in the stove by saying that he was in the habit of raking up chips where he chopped his wood, using them to light his fire, and that he had probably at some time accidentally gathered with them an exploded shell. He admitted that he had seen McIntyre near the mouth of Collar Gulch on June 27. He denied, however, that he had left the road to avoid a meeting, and said he had taken a cut-off trail leading through the brush to his home by a shorter route. It appears from McIntyre's own statement that the two were not on friendly terms. He testified that he did not own a light shirt at all, and never wore one. The evidence is silent as to whether such a garment was found in his cabin. He was in Lewistown on June 14 and 15. It appears from his own statement and those of several other witnesses that he was then clean shaven. He denied that he was at the store of the Judith Hardware Company at all while he was in Lewistown. His saddle-horse was shown to be very gentle, requiring neither hobbles nor picket rope because it would permit anyone to approach it. The condition of its legs when seen by the sheriff was accounted for by the statement that on July 4 there had been a severe hail-storm, and that in drifting before the storm the horse had run into a barb-wire fence, and hurt himself. He stated that he did not know anything about the whereabouts of the deceased on June 28 or anything of the discovery of the Hertford claim, other than what he had heard in the testimony of witnesses at the trial. At the time of the homicide he was fifty-nine years of age. He had been a resident of Fergus county since 1881, and had resided where he now lives for ten years. One other item of evidence which we omitted to state in

its proper place we add here. The physician who examined the body of deceased on July 30 stated that in his opinion death had occurred from twenty-four to forty-eight hours prior to the examination.

In summarizing the evidence we have observed the rule that every conflict in the statements of witnesses as to any material fact must be resolved in favor of the finding of the jury. That the deceased was foully murdered on the afternoon of the day he was seen going to his work at the Hertford claim, there is no room for doubt. Do the circumstances point out the defendant as the murderer so clearly as to exclude all reasonable doubt of his guilt? This question must be answered in the negative, unless the circumstances can bear the test required by the rule applicable to cases where a conviction is sought upon circumstantial evidence, to-wit: That all the circumstances proved must be consistent with each other and with the hypothesis that the accused [1] is guilty, and at the same time inconsistent with any other rational hypothesis. (*State* v. *Allen,* 34 Mont. 403, 87 Pac. 177; *State* v. *Northern Pacific Ry. Co.,* 41 Mont. 557, 111 Pac. 141; *Smith* v. *State,* 61 Neb. 296, 85 N. W. 49; *Lancaster* v. *State,* 91 Tenn. 267, 18 S. W. 777; *State* v. *Asbell,* 57 Kan. 398, 46 Pac. 770; *Bryant* v. *State,* 116 Ala. 445, 23 South. 40; 12 Cyc. 488.)

The theory of counsel for the state is that the defendant, being on unfriendly terms with the deceased, crept upon him while he was at work, and shot him, having previously extracted a charge of birdshot from a Peter's Ideal shell, and replaced it with buckshot specially for this purpose. This inference they draw from circumstances which they insist are fully established, *viz.:* That the defendant had buckshot in his possession on June 15; that exploded Peter's Ideal shells were found about his cabin; that such wads as are used in loading them were found near the body of the deceased; that there were on one of these impressions of buckshot and upon the other of smaller shot; that the burned butt of such a shell was found in the ashes of defendant's stove, bearing indications that it had been exploded by defendant's gun; that a loose wad and two remnants were found in the cabin; that the gun had recently been fired, and that streaks in the bore

indicated that the last charge fired from it consisted of buckshot; that several days afterward the shoulder of defendant was bruised as if by the recoil of a gun, and that he was seen to go toward the Hertford claim on the morning of the day of the murder, and late in the afternoon was seen returning to his home from that direction. Of course, if all of these facts were clearly established, there would be ground for the conclusion reached by the jury; but when we subject the evidence to analysis it is not sufficient, to say the most, to warrant any conclusion other than that there is a strong suspicion that the defendant is guilty. No attempt was made by the witness who saw the man ascending the wall of the canyon toward the place of the homicide to identify him as the defendant. The facts observed as to the clothing and movements of this man do not tend to identify him as the defendant. He was then only a few hundred feet away from the Hertford claim. If he was the assassin, he was at that time evidently on his way to the place of his intended crime, in plain view of any person who happened to be on the road or about the mines to the north. Moreover, he must have remained in the vicinity for about four hours lying in wait. He was on foot, wearing a light shirt, evidently in his shirt sleeves, while the unidentified man seen going toward defendant's home in the afternoon was dressed in dark clothes and was on horseback. It may be noted here, also, that the witness who observed this man failed to state whether he had a weapon. From the presence of the horse and man tracks leading away from near where the body lay, and the faint trail found in the park to the west of the canyon road, counsel insist, also, that the inference should be drawn that the defendant, having come on horseback, hobbled his horse in the park, and went up on foot to the Hertford claim from the west. Assuming that the person seen in each instance was the defendant, we have him appearing first from the north on foot, without any effort of concealment, and then from the west with every effort to avoid being seen. In the meantime he had changed his clothes and obtained a horse. These circumstances, shown to furnish a basis for the inference that the defendant was in proximity to the place about the time the crime

was committed, are inconsistent with each other. If the identification had been made by substantial evidence in either case, then the burden might have been upon the defendant to offer evidence to explain his presence there at that time. As it is, there is no basis in this feature of the evidence for the conclusion that the defendant's statement that he was at home during the whole of June 28 is untrue.

Nor do we think that, if it be assumed that the defendant purchased buckshot in Lewistown on June 15, the finding of the gun wads near the body, though they bore the marks they did, should impel a reasonable person to the conclusion that defendant fired the shot. It is not specially significant that exploded shells were found about his cabin. Such as were found had been exploded long before June 28. It is not likely that having in his possession a single unused shell and at the same time other weapons which would have answered his purpose just as well, together with an ample supply of ammunition for them, he went to the trouble of loading it with buckshot in order to commit the murder, and then taking the precaution to conceal it by burning in the stove. It is true that this may have been done, but that it was done is a speculative conclusion, rather than a legitimate inference to be drawn from the facts established by the evidence.

The testimony of the salesman as to the identity of the man who purchased the shot on June 15 is exceedingly vague and indefinite. He stated substantially that he could not say whether the defendant was the same man, and, though he afterward said that according to his best judgment he was, the features by which he fixed the identity at the trial differed substantially from those upon which recognition was based at the coroner's inquest. So that, though the testimony of Langdoc be accepted as true, as to the conversation had with defendant on the evening of June 14. the conclusion that the defendant was the purchaser rests upon very unsubstantial evidence. The same may be said of the streaks observed in the bore of the gun.

So, too, the evidence relied on to supply the motive for the murder is of little, if any, criminatory value. The fact that the defendant had the deceased arrested and confined in peace pro-

ceedings of itself tends to show the absence of motive. By this act he demonstrated that at that time he was not disposed to take the law in his own hands. He proceeded under the statute to prevent the deceased from carrying out threats of violence which he had evidently theretofore made. (Rev. Codes, sec. 8941 *et seq.*) This would seem to indicate a disposition on his part not to offer the deceased any personal violence. There is not a syllable of evidence tending to show animosity retained by the defendant toward the deceased, nor that the defendant at any time made any threats or expressed any ill-will toward him, nor that he feared personal violence from the deceased after his release from jail. What motive, then, prompted the defendant to commit the crime? This inquiry cannot be answered from the [2] evidence. It is not indispensable that a motive be shown if the facts otherwise tend to show that the crime has been committed; but its presence or absence is always more or less significant in the light of the facts of the particular case. (*State* v. *Lucey*, 24 Mont. 295, 61 Pac. 994.) The absence of it is of special significance in a case like the present, where the conclusion of guilt, if sustained at all, must be sustained upon the statements of witnesses the truth of which is in many instances doubtful, and remote inferences the correctness of which is open to serious question.

The conversations had with the sheriff at the time of the arrest [3] and a few days before with another witness at Giltedge are not, in view of the circumstances, to be construed as implied admissions of guilt. Before the defendant made the statement attributed to him at Giltedge, the witness had told him of the evidence obtained against him, and that he was suspected. Evidently the defendant had this in mind at the time he was arrested, and hence the question to the sheriff as to the amount of evidence the authorities had against him. Nor, in view of the habits of defendant, is any weight to be attached to the testimony of McIntyre as tending to show that defendant was lying in wait for deceased in the neighborhood of Collar Gulch on June 27.

Assuming that the shoulder of defendant bore the mark of a healing bruise at the time of his arrest, it is not reasonable to suppose that a single discharge of an ordinary sportsman's shell, even though loaded with buckshot, would produce such an effect. This is contrary to common experience. But, assuming this to be true, the fact that the bruise was there is as consistent with the notion that it was produced by some other cause as it is that it was produced by the shot that killed deceased. The conversation had with a witness in relation to deceased and the hounds conveys the idea that the defendant had no fear of deceased, nor at that time any present intention of hunting him up in order to have a personal encounter with him. The evidence wholly fails to show that the defendant had any knowledge of the location of the Hertford claim or that the deceased was at work there at the time of his death.

Viewed separately, most of the circumstances adverted to are **[4]** as consistent with the notion that defendant is innocent as they are with the hypothesis that he is guilty. Taken altogether, they do not exclude the hypothesis of his innocence, but, as already said, only go so far as to induce the conclusion that he is probably guilty. This is not sufficient to justify a conviction. In *State* v. *McCarthy*, 36 Mont. 226, 92 Pac. 521, this court said: "There must be some substantive testimony to justify the judgment of a court. * * * Mere suspicions or probabilities, however strong, are not sufficient basis for a conviction of crime." (See, also, *State* v. *Foster*, 26 Mont. 71, 66 Pac. 565; *State* v. *Duncan*, 40 Mont. 531, 107 Pac. 510.)

This conclusion renders it unnecessary to consider the second contention made by counsel.

The judgment and order are reversed, with directions to grant the defendant a new trial.

*Reversed and remanded.*

MR. JUSTICE SMITH and MR. JUSTICE HOLLOWAY concur.