[Crim. No. 526. Third Appellate District.—July 28, 1920.]

# THE PEOPLE, Respondent, v. LOUIS SILVA, Appellant.

[1] CRIMINAL LAW—GRAND LARCENY — VERDICT — INSUFFICIENCY OF EVIDENCE.—In this prosecution for the crime of grand larceny, while the evidence was sufficient to show that there was available to the accused some opportunity to commit and to generate a suspicion that he might have committed the crime, the evidence was wholly insufficient to ·support the verdict of guilty.

[2] ID.—CIRCUMSTANCES COMPATIBLE WITH INNOCENCE—REASONABLE DOUBT.—Where all the circumstances proved, taken together, are as compatible with innocence as with guilt, a situation sufficient to raise a reasonable doubt of guilt arises.

[3] ID.—CONVICTION ON CIRCUMSTANTIAL EVIDENCE—WHEN PROPER.— In order to sustain a conviction on circumstantial evidence, all of the circumstances proved must not only be consistent with each other, but consistent with the hypothesis that the accused is guilty, and at the same time inconsistent with the hypothesis that he is innocent, and with every other rational hypothesis except that of guilt.

[4] ID.—PRINCIPALS IN COMMISSION OF CRIME—EVIDENCE—ERRONEOUS INSTRUCTION.—In this prosecution for the crime of grand larceny, there having been `absolutely no evidence tending in the slightest degree to establish a confederation between the third person who

was in the room at the time the act was claimed to have been committed and the defendant for the purpose of stealing the money of the prosecuting witness, except the bare fact that all three had been present in the same room, an instruction in the language of section 31 of the Penal Code, declaring who are principals in the commission of a crime, is erroneous.

APPEAL from a judgment of the Superior Court of Sacramento County. Malcolm C. Glenn, Judge. Reversed.

The facts are stated in the opinion of the court.

S. Luke Howe and R. B. Hibbitt for Appellant.

U. S. Webb, Attorney-General, and J. Chas. Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendant was by information charged with and by the jury convicted of the crime of grand larceny in the superior court of Sacramento County, and appeals from the judgment and the order denying him a new trial.

The specific charge stated in the information is that the defendant stole the sum of $480 from one John Glavich, in the city of Sacramento, on the twenty-ninth day of December, 1919.

[1] The principal point upon which the defendant relies for a reversal is that the evidence does not support the verdict, and in the outset it is just as well to announce our conclusion to be, after a careful examination and study of the evidence, that the contention of the defendant that there was not legal justification for his conviction is well taken. The consideration of this point will require rather an extended review herein of the evidence. In doing this, we shall, except in a few instances, narratively state the facts as they were shown by the evidence.

One Lena Casella, a female, was, in the month of December,. 1919, the owner of and conducted a lodging-house at 1017½ Second Street, in the city of Sacramento. On the twenty-fourth day of December of said year said John Glavich, a resident of Sutter City, in Sutter County, went to Sacramento and on that day hired a rcom in the lodging-house of Mrs. Casella. Glavich, when he hired the room in said house, had in his possession approximately the sum

of six hundred dollars, in currency, which he carried in a leather wallet or purse in the hip pocket of his pantaloons. During the four or five days immediately preceding the twenty-ninth day of December, 1919, the time at which the defendant appeared upon the scene, Glavich had remained in his room almost constantly and on all those days he and Mrs. Casella diverted themselves by drinking more or less intoxicating liquors, the latter furnishing the liquors and the former paying for the same. While to a greater or less extent Glavich was, during all this time, under the influence of intoxicants, he was at no time or on no occasion in such a condition of inebriety as to render him insensible to what was going on or what he did. Up to the time that the defendant had found his way to the Casella lodging-house, Glavich had expended about one hundred dollars of the sum of which he was possessed when he first appeared at and secured lodgings in the Casella apartments.

On the twenty-ninth day of December, 1919, about the hour of 6 o'clock P. M. or a trifle later, the defendant, as already stated, went to the Casella lodging apartments. Here it is to be said that there is no testimony in the record, other than that of the defendant himself, showing the circumstances under which or the reason for which the defendant visited said lodging-house on the occasion mentioned, and we must, therefore, rely solely upon his testimony for information as to those matters.

The defendant, whose home was in Sonoma County, was, at the time of the alleged larceny here complained of, and had been for some time previously, employed at the Sisters' Hospital, in the city of Sacramento. He testified that on the day and at the hour above stated he left said hospital for the purpose of calling on an acquaintance by the name of Jack Mosher, who, on a previous occasion, had told him that he (Mosher) was rooming at the Casella place, and who had invited the defendant to come to the said lodging-house and pay him a visit. The defendant had never been in Mrs. Casella's apartments prior to the evening on which the alleged larceny was committed, and had never previously met Mrs. Casella. On arriving at the lodging-house on the evening referred to he entered the apartments and met Mrs. Casella and inquired for Mosher. Mrs. Casella

informed him that, although Mosher had a room in her house, he was not at that time in his room or about the place. The defendant was then invited by Mrs. Casella to accompany her to her kitchen and there have a ''drink'' with her. He accepted and, going into the kitchen, he there met Glavich for the first time, the latter then being a stranger to him. The defendant remained at Casella's for some time and with the landlady and Glavich had a number of drinks of intoxicating liquors.

We return now to the testimony presented by the people.

Glavich testified that, just before the defendant appeared at the lodging-house, he took the pocketbook containing his money from his pocket in the presence of Mrs. Casella. He further testified that he did not exhibit the pocketbook after the defendant went into the kitchen nor at any time while the defendant was present did he take the purse from his pocket. He also stated that he did not know whether or not the defendant knew that he had any money on his person. The witness said that neither he nor Mrs. Casella, or Silva left the room after Silva entered it. At some point of time between the hours of 8 and 10 o'clock, Glavich continued, he placed his hand in the pocket in which he had always carried the pocketbook and then discovered that it was missing, and thereupon, addressing Mrs. Casella, asked her to return to him the pocketbook. She denied having it or knowing anything of its whereabouts. He then asked the defendant if he had his money, to which the latter answered in the negative. He thereupon said to both Mrs. Casella and the defendant that he intended going after an officer for the purpose of having the defendant arrested and, suiting his actions to his words, left the lodging-house and soon returned with two police officers, who asked both Mrs. Casella and the defendant if either had the money of Glavich or knew where it was, and they replied that they neither had his money nor knew anything about it or its whereabouts.

The complaining witness was asked if he did not testify at the preliminary hearing of the charge that the last time he saw his pocketbook was about 5 o'clock of the day on which the defendant appeared at the lodging-house, and he replied that, while he had no recollection of so testifying on the occasion named, he might have done so, and that if

he did it was the truth, as (he continued) the circumstances occurring on the day he lost his purse were fresher in his mind when the preliminary hearing was held than they were at the time of the trial.

F. W. Cameron, one of the police officers to whom Glavich made the complaint of having been despoiled of his money, and who accompanied Glavich to the lodging-house to investigate the complaint, testified, in substance, as follows: That he and another officer went to the lodging-house to investigate the complaint made by Glavich, and found Mrs. Casella and the defendant in the kitchen. Glavich, he said, at that time accused Mrs. Casella of having taken his money. He did not then charge the defendant with taking the money or of knowing anything about it. The officer asked both Mrs. Casella and the defendant if they or either of them had taken the money, and each strenuously denied having done so or having any knowledge of where his money was. The two officers thereupon searched every room in the place and then Officer Cameron, with a flash-light, went to the toilet, accompanied by the defendant, and "searched around" in there but found no trace of the pocketbook or the money. The defendant remained outside but near the toilet while the officer was in there making the search, but immediately upon the officer leaving the toilet, the defendant entered it, leaving the door open so that the officer could see him or his form sufficiently to enable him (the officer) to observe his movements while in there. After the officer and Silva returned to the kitchen, the former asked Glavich if he thought Silva had his money, to which question Glavich replied: "I don't know." The officer then asked Silva if he had any objection to being searched, to which the defendant answered: "Why no; search me," and the officer thereupon searched the accused but did not find the pocketbook or money. Immediately thereafter, the officer returned to the toilet and finally found the purse in the bowl, "underneath the water. I had to look pretty close to see it," continued the officer. "It started to go down, in the flow that flushes off, and the water was dark, you know, and I had quite a time to see it." The purse contained four twenty-dollar bills. The officer, after finding the purse, immediately returned to the kitchen and exhibited the wallet to Glavich, who readily identified it as

the purse he had lost and which had contained his money. The defendant, when the purse was shown to Glavich by the officer, addressed the latter, saying: "You went with me to the toilet; you know I didn't throw anything in there." The officer testified that the condition of the light about the toilet was such that, although he stood near the toilet and the door leading into it was open when the defendant was in there, he could not "detect any of his [defendant's] actions."

The foregoing facts are taken from the testimony in chief of the officer. On cross-examination, he testified: "Q. Mr. Cameron, when you went back up there, the first thing this man did was to accuse the woman of taking his money? A. Yes. Q. Said she was the one that robbed him? A. That is right. Q. And then you went out,—you searched the premises and you did not find anything? A. No. Q. Searched the kitchen and searched the bedroom, I suppose. A. Yes. Q. Did not find any money? A. None; none at all. Q. And later on you searched the defendant, and you did not find any money on him? A. No. Q. Of course, Mrs. Casella was a woman? A. Yes. Q. And you did not make the thorough search of her that you did of the defendant? A. No. Q. And she might have had the money on, and you not find it? A. Oh, I suppose it could have been concealed about her person. Q. Yes. Well, in other words, being a woman, you did not make the careful search of her that you did of the defendant? A. As a matter of fact, we did not search her. Q. Did not search her? A. No. Q. All right. Now, when you went back to the toilet with Mr.—Oh, by the way, the water in the bowl was muddy, was it not? A. Yes; it was slightly muddy, but the—but not more than that the bowl or that the porcelain bowl was discolored, was all dirty; it was hard to see. Q. It was difficult to see, because of the dirty bowl and the fact of the muddy water? A. The water, and the bowl— Q. Int. The water and the bowl were somewhat the color of this, were they not [referring to the pocketbook in evidence]? A. Yes; something like that. Q. Yes. Now, you went with Mr. ——, the defendant, to the toilet? A. Yes. When you found it, as I understand you to say in your testimony, that you had to look pretty close to find it, when you went back there? A. Yes. Q.

You had to look pretty close into the bowl, and the flash of your light down there, before you found it? A. Yes. Q. Now, it was in the pipe part; that is, that leads from the bowl, was it not? A. Yes. Q. Covered by the water? A. It had started to go down. Q. Started to go down, covered by the water? A. Yes. Q. And you couldn't by just flashing your light around casually, you couldn't see it, but you had to look very carefully? A. Yes; I got the light right down into it. Q. Now, when you went into the toilet first, Mr. Cameron, the defendant was right there with you? A. Yes; he stood at the door. Q. And you simply went, by reason of the fact that he was standing there, and hurriedly looked around; you did not make as careful a search of the bowl at that time as you did later, when you found it? A. No; I didn't. Q. Yes. Now, when you found it, it had the appearance of having been flushed that far, did it not, as though the cord had been pulled and the pocketbook had been forced down into the pipe? A. Yes. Q. And did you hear this defendant flush the toilet while he was in there? A. No; no I didn't. Q. He did not flush the toilet? A. No. Q. For all you know, the pocketbook might have been in the water when you first examined the toilet? A. Well, it might have been. Q. All right. The defendant never at any time,—I mean the complaining witness never at any time accused the defendant of taking his money? A. No; he didn't." Recross-examination: "Q. You did not see Mr. Silva at any time lean over while he was in the toilet, as though he was pushing anything down in the toilet? A. No. Q. He stood up all the time, didn't he? A. Yes; he stood up."

It was stipulated that the transcript of the testimony presented before the committing magistrate at the preliminary examination of the charge showed that at said hearing Glavich testified that the last time he saw his purse on the twenty-ninth day of December was about 5 o'clock in the afternoon, and that he did so testify at that time.

The defendant, testifying for himself, denied having taken Glavich's purse or money or both. He stated that in the time intervening between the departure of Glavich from the lodging-house and his return with the officers, Mrs. Casella left the kitchen and went to some other part of the lodging-house, returning, however, before Glavich re-

turned. There is no contradiction of this latter statement.

There has now been given herein an epitomized but a full and fair statement of all the testimony which was presented to the jury in the case. No important fact or circumstance has been omitted therefrom, and from that statement it will readily be observed that there are but two circumstances from which any possible theory may be deduced that the defendant took the purse from Glavich, to wit: 1. The opportunity incident to his presence in the room with Glavich for some hours; 2. The visit by the accused to the toilet under the circumstances above indicated. Indeed, the testimony really furnishes but one consideration by which the verdict can be upheld and that is the fact that there was available to him, the accused, some opportunity to commit the crime by reason of the fact that he was with Glavich in the room for several hours. As to the circumstance of opportunity, though, it is plain from the evidence that Mrs. Casella's opportunity for taking the money was infinitely superior to that of the accused. As against her, the evidence, it will be noted, shows these circumstances: That Glavich had been with her almost all the time for a period of five days; that he roomed at her house, drank with her and paid for the drinks; that she had seen his pocketbook in his hand and had seen him take some money therefrom. She, in short, knew that he was fairly well supplied with money.

Now, with respect to the circumstance of the defendant's visit to the toilet, in the absence of which circumstance it is probable he never would have been charged with the crime, these facts appear, having been testified to by the police officer: That the latter went to the toilet accompanied by Silva; that the officer first entered the toilet and made a superficial examination thereof, merely casting his eyes into the bowl; that it contained water having a muddy or murky appearance—of a color, indeed, similar to that of the missing pocketbook; that, thereafter, the defendant entered the toilet, the door thereof remaining open while he was in there and the officer at the same time standing near the door in a position from which he observed the form of the accused; that the latter did not, while in the toilet, stoop or pull the cord that would flush the bowl; that, in fact, the defendant did not flush the bowl; that

he (the officer) subsequently returned to the toilet and made a more thorough examination of the bowl and therein, by the aid of his flash-light, and placing his hand in the bowl, found the purse underneath the water, and in the pipe at the joint where the pipe was connected with the bowl, said pipe serving as a conduit for carrying into a cesspool anything flushed into it from the bowl. The officer stated, as will be observed, that he looked "more closely" into the bowl the second time he was in the toilet than he did the first time he was in there. He further stated it as his opinion that the bowl must have been flushed to have put the purse in the position in the pipe in which he found it.

It seems very clear to our minds that the most that can reasonably be said of the testimony thus reviewed is that it is sufficient only to generate a mere suspicion that the defendant might have committed the crime of which he was convicted. There is no testimony that anyone saw the defendant near enough to Glavich to enable him to have abstracted the purse from the pocket of the complaining witness. Indeed, there is no testimony that the defendant knew that Glavich had a considerable sum of money on his person, or that he had any money at all, or, if he did have money, where on his person he carried it. Moreover, when Glavich left the lodging-house for the avowed purpose of securing an officer and having the matter of the loss of his money investigated by the officer, the defendant remained in the lodging-house until Glavich returned with the officers, and in no manner acted like a man who had committed a wrong or a crime. Furthermore, it is a fact of some significance that Glavich, upon returning to the lodging-house with the officers, accused Mrs. Casella of taking the purse and the money, but made no such accusation in the presence of the officers against the defendant; and parenthetically we may suggest that Glavich, knowing all the circumstances, occurrences, and situations connected with the presence of himself, Mrs. Cassela, and the defendant in the kitchen preceding the time he missed his purse, his opinion then as to who took his money constituted a circumstance of no little force. But however that may be, it is to be noted that the strongest circumstance against the defendant is the finding of the purse in the bowl of the toilet after he

had been there; but that circumstance loses much, if not all, of its force as applied to the defendant when these facts are considered: 1. That the officer did not make a very thorough search when first he went into the toilet; 2. That the water in the bowl was of a dark or murky appearance —in fact, the color of the purse, the officer said—and it is very plain that the purse could not have been seen by a mere glance into the bowl even if it were floating upon the surface of the water and much less readily could that have been done with the purse underneath the water and partly in the pipe; 3. That the defendant, according to the positive testimony of the officer, neither flushed the bowl while in the toilet nor stooped, which would have been a necessary movement and indeed the only way, other than by flushing the bowl, to have enabled him to place the purse in the position in which it was found by the officer.

But, as above stated, the whole case against the accused rests upon the mere fact that he had a possible opportunity for committing the crime—not, however, even the opportunity that was available to Mrs. Casella.

In *People* v. *Tarbox*, 115 Cal. 57, 63, [46 Pac. 896, 897], the supreme court, after recounting certain circumstances which were proved and which it was maintained by the people were of an incriminatory character of such force as to support the verdict, had this to say: "If the evidence had stopped there, it is clear that there could have been no conviction, for the opportunity to commit an offense can have no weight, apart from other circumstances, unless it excludes all reasonable opportunity for its commission by another, and standing alone, is sufficient to sustain the verdict." (See, also, *State* v. *Suitor*, 43 Mont. 31, [Ann. Cas. 1912C, 230, 114 Pac. 112].)

In considering the evidence, we have not been unmindful of the rule that, in all cases, the evidence, even though conflicting, must be considered and resolved favorably to the finding of the jury. Here, however, there is no conflict in the evidence, and, as stated, it tends only, so far as the accused is concerned, to show that there was available to him a possible opportunity for committing the crime.

[2] Where, as is certainly true here, all the circumstances proved, taken together, are as compatible with in-

48 Cal. App.—47

nocence as with guilt, a situation sufficient to raise a reasonable doubt of guilt arises. (*United States* v. *Hart,* 78 Fed. 868.)

[3] "In order to sustain a conviction on circumstantial evidence, all of the circumstances proved must not only be consistent with each other, but consistent with the hypothesis that the accused is guilty, and at the same time *inconsistent with the hypothesis that he is innocent, and with every other rational hypothesis except that of guilt.*" (16 Corpus Juris, p. 763; *People* v. *Nelson,* 85 Cal. 421, 431, [24 Pac. 1006]; *People* v. *Ward,* 105 Cal. 335, 341, [38 Pac. 945].) Of course, that rule has application to those facts only which are essential to a conviction, but in this case the facts or circumstances relied upon for a conviction and upon which, indeed, the verdict must rest, if it may stand at all, are not, as we have pointed out, incompatible with the hypothesis of the innocence of the accused.

Our conclusion is, as is manifest from the foregoing discussion, that the evidence upon its face is wholly insufficient to sustain the verdict. No man's liberty should be taken from him upon such a showing. It certainly cannot be said with justness that the evidence is such in probative power or persuasive force as to produce in any fairminded person, who has not been confused by or has not misapprehended and misapplied the law as it was stated to the jury by the court, an "abiding conviction, to a moral certainty," of the truth of the charge as against the defendant.

[4] The complaint is made that the court erred to the prejudice of the defendant by giving to the jury the following instruction: "All persons concerned in the commission of a crime, whether it be a felony or misdemeanor, or whether they directly commit the act constituting the offense or aid and abet in its commission, or not being present have advised and encouraged its commission, are principals in the crime so committed." The instruction is in the language of section 31 of the Penal Code, and of course states the law correctly; but we do not think that it should have been read to the jury under the circumstances of this case. The necessary implication from the instruction, in the light of the situation as it was developed by the evidence, was that there was evidence tending to show that the taking

of the purse and money of Glavich was the result of the joint acts of Mrs. Casella and the defendant. Save and except the bare fact that the defendant had been present in the kitchen with Mrs. Casella and Glavich, there is absolutely no evidence tending in the slightest degree to establish a confederation between Mrs. Casella and the defendant for the purpose of stealing the money of Glavich, and that fact alone could not justly be made the predicate for such a theory as the instruction exemplifies. And we doubt not that the instruction influenced the jury to a very great extent in reaching the conclusion evidenced by their verdict. We may add that Mrs. Casella was not a witness in this case, nor is there anything in the record indicating whether she was arrested on the charge or what became of her. But be that as it may, as has been declared, the verdict, in our opinion, does not derive sufficient support from the evidence, and the judgment is, therefore, reversed.

Nicol, P. J., *pro tem.*, and Burnett, J., concurred.