STATE, RESPONDENT, v. McWILLIAMS, APPELLANT.

(No. 7,532.)

(Submitted April 22, 1936.   Decided May 9, 1936.)

[57 Pac. (2d) 788.]

*Mr. E. K. Cheadle,* for Appellant, submitted a brief and argued the cause orally.

*Mr. Raymond T. Nagle,* Attorney General, and *Mr. Enor K. Matson,* Assistant Attorney General, for the State, submitted a brief; *Mr. Matson* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

On September 2, 1934, approximately sixty bushels of wheat were stolen from a granary standing in a field some distance from the highway between Lewistown and Moore, in Fergus county. This wheat was the property of John Sampson. As a result of certain investigation made by the sheriff and Sampson, A. J. McWilliams and Ralph Bacon were charged with the crime of burglary and were brought to trial on July 13, 1935. At the close of the state's case the defendants moved for a dismissal on the ground of the insufficiency of the evidence to warrant a conviction; thereupon the court directed a verdict in favor of Bacon, but required McWilliams to proceed with his defense. The trial resulted in a verdict of guilty, fixing the punishment at one year in the penitentiary. From the judgment of conviction McWilliams has appealed and here contends that the evidence was entirely insufficient to warrant the verdict and judgment.

All of the evidence adduced at the trial may be summarized as follows: On Sunday, September 4, 1934, McWilliams, a farmer in the Lewistown district, driving an old Chevrolet truck belonging to his brother, took his wife and two small children to the ranch home of Ralph Bacon, in the same district. In the afternoon Bacon desired to go to the home of an uncle, Bert Bacon, to look at a cow. The two men made the trip in the McWilliams truck, which broke down causing delay, and it was late when they returned to the Ralph Bacon ranch. The highway they traversed passed the entrance to the field from which the wheat was stolen; thus they were shown to have had the opportunity to commit the crime. Near this field, in the afternoon, the two men inquired the way to the Bert Bacon place of a man named Moritz, who, with one Olson, had a lease on the Sampson field. . Moritz testified that, at that time, "I noticed something in the truck that looked like burlap sacks; they were right behind the cab of the truck." On cross-examination

he stated: "I had no particular reason to examine them closely; I have the impression they looked like sacks. I would judge there were twenty or twenty-five." Mrs. McWilliams testified that the things in the back of the truck were a car cushion and quilt, and possibly a coat, for the children to sit on, but she saw no sacks.

The opening to the granary was closed about halfway up by boards dropped into slots, and the upper part was covered by an old door nailed over it. The leaser, Olson, testified that he saw the door in place on Saturday evening, but Monday morning found it hanging by a nail in the left-hand upper corner, and discovered that some wheat was gone; he reported to Sampson, who called the sheriff; a deputy was sent out, and he and Sampson investigated. A truck or automobile coming from the west had entered the field, parked about 25 feet from the granary, and left the field going east. Owing to the condition of the ground, on most of which grass and weeds were growing, no very clear impression was left, but that of the outgoing vehicle was deeper, indicating that it was then loaded. Sampson testified that there had been a light rain Sunday night and he estimated that the tracks were made "some time after 2:30 Sunday morning and Monday when I went there." The only distinguishable tracks were those of the two right wheels where they crossed a depression on turning into the field; of these plaster of paris casts were made. Considerable wheat had been spilled on the ground between the granary and the place where the vehicle had been parked. The investigators followed the track onto the road going west, but the road was graveled and showed no imprint or tire tracks. At the Bert Bacon place they found imprints which, from memory, they determined were the same as those of which the casts were taken. Returning to the entrance to the road, the investigators continued east to the Ralph Bacon ranch and found three or four places where the truck in question had gotten off of the gravel and left tracks such as those they found at the Bert Bacon place and found like imprints at the McWilliams ranch.

Sampson testified that: "Later we saw tires that resembled those imprints on an old Chevrolet truck in the neighborhood of Half Moon Pass, which is up the East Fork from Lewistown; * * * the defendant was in possession of the truck." The witness then testified that the "imprints in the field near the granary" corresponded "one hundred per cent. with the tires I examined on the truck." The casts were introduced in evidence and are before us; they show a faint and imperfect pattern of old tires worn almost smooth. Sampson testified further: "My comparison was from recollection from how the cast looked, and how the imprints in the soil looked; it was all from recollection." Neither he nor the sheriff's force compared the casts with the tires on the McWilliams truck, nor were the tires brought into court or exhibited to the jury. The witness did not see the truck until hours after he had seen the imprints in the soil as recorded on the casts. On examination of the truck it developed that it was mounted as follows: A Peerless tire on the right rear and the left front wheel; a Goodyear Diamond tread tire on the left rear and a Sieberling on the right front wheel; all were old, worn tires.

On direct examination Sampson said nothing as to the imprints found where a vehicle went into the field, except those of which casts were taken in the depression at the side of the entrance, and it was intimated that they could not get other imprints because of the growth of grass and weeds. On cross-examination Sampson said: "I could not learn anything from the impression of the left front tire going in. The left rear one was the only one I could figure out. It was an old Goodyear Diamond tread, * * * it is the only tire I recognized. The right rear tread made a poor impression."

As indicating the extent of the comparison between the casts, or Sampson's recollection of them, and of the imprints in the soil at the entrance to the field, with the tires found on the McWilliams truck, the following testimony is enlightening: Counsel for defendant called attention to four parallel depres-

318

sions in the case of the imprint of the right front tire, and asked:

"Did you observe four corresponding marks on the right front tire of the truck when you saw it up in the mountains? A. I didn't count them, no. * * *

"Q. You couldn't tell how many there were on the tire then? A. I could have if I had taken—

"Q. Yes, but didn't? A. No, I didn't.

"Q. You didn't do that? And here you will notice that the impressions become indistinct, so that only the two middle ones show any trace. Did you see that on the tire anywhere? A. No, I think that is in the dirt where we took the impression.

"Q. Now, taking Exhibit B, you will notice that there are two marks running the length of this imprint in the middle, and at the side two irregular depressions. Did that correspond to the right rear tire? A. That is not a very good impression, for some reason or other, but it does correspond in a general way to that right rear tire."

The testimony of the sheriff and jailer was to the effect that they had seen the tracks in the field and along the road and at the Bacon ranch, and they all corresponded to the tires on the right side of the truck; but neither spoke of the imprint of a Diamond tread tire within the field and seemed to be of the impression that the only discernible imprints there were those of which the casts were taken.

One Howard Piper testified that he lives about 400 yards from Ralph Bacon's place, and that he saw Bacon come into his place about 4 o'clock in the morning in the Chevrolet truck, but he did not know who was with him, and "did not see him doing anything unusual." He said further, "it was just break-ing day."

Mrs. Piper testified to the same homecoming, but placed the time at "4:30" and the distance between where she was and where she saw Bacon at "nearly a quarter of a mile." She testified that on Wednesday morning she saw Bacon walking

toward his house "between 5 and 6 in the morning," and "it looked as if he had a sack in his hand."

After his arrest McWilliams offered to pay for the lost wheat, valued at $50, if the case was dropped, saying that he would rather pay that amount than go to trial, "as that was the cheapest way out." In the conversation he denied that he had taken the wheat. This offer constitutes the only difference between the case against McWilliams and that against Bacon; yet the court held that there was not sufficient evidence to go to the jury as against Bacon, but refused a like motion on behalf of McWilliams.

A thorough search for the wheat was made without result. It had not been sold at any elevator in the district, and no trace of wheat was found at the home of the accused or in the truck.

The evidence is, perhaps, sufficient to prove that a burglary was committed at the time and place charged and that McWilliams and Bacon had the opportunity to commit the crime; they were out late that night and drove along the road from which the field in which the granary stood was entered by someone. The case made, however, depends entirely upon circumstantial evidence. If it can be said that the crime was brought home to McWilliams, it is only because the jury was justified in declaring its belief "beyond a reasonable doubt" that McWilliams drove his brother's truck into Sampson's field, and this belief can only arise from proof "beyond a reasonable doubt" that the dim, imperfect, and unsatisfactory imprints preserved in the plaster casts were made by the two old tires on the right-hand wheels of the truck. Had the wheat been traced to the possession of the defendant, such possession would have been a sufficient circumstance on which to convict; but it seems incredible that, if the wheat was loaded into that truck at night, even in sacks, a quantity being spilled on the ground, no single kernel of wheat could be found in the rough box of the truck.

While it is possible that the tires on the truck corresponded "one hundred per cent." with imprints found on the highway

and at the Ralph Bacon place—for the truck unquestionably traveled that route—Sampson's testimony as to his recollection, when checked against the only intelligible imprints left in the field, as registered on the plaster casts, does not support the "one hundred per cent." declaration. And while the other witnesses were positive, in a lesser degree, viewing the faint impression of practically smooth tires shown by the casts, we cannot conceive how, hours later, and without comparison of the casts with the tires, any man could be even reasonably sure that the imprints were made by those particular tires. There are faint impressions of lines and "nubs" showing on the casts, and it might be possible by measurements and careful comparison for a tire expert to say that those impressions were made by the tires on the truck, but nothing of this kind was attempted; the tires were not even brought into court for comparison by the jury. The deduction was made from the testimony of witnesses who could have had but a dim impression of the imprints in the field and may have been misled by clearer imprints found out on the road or at the Bacon place. There may be many old trucks riding on worn tires in Fergus county, which, in the absence of some sort of scientific checking, would seem to leave tracks identical with those left by the truck here described, but not produced.

Viewing the evidence in the light most favorable to the state, it presents a strong probability, a justifiable suspicion, or gives rise to a shrewd suspicion that the defendant is guilty; but this is not enough. "One charged with a crime may not be convicted on conjecture, however shrewd, on suspicion, however justified, or on probability, however strong, but only upon evidence which establishes his guilt beyond a reasonable doubt." (*State* v. *Cooper*, 78 Mont. 35, 252 Pac. 376; *State* v. *Konon*, 84 Mont. 255, 274 Pac. 1060.)

It is true that a conviction may be had upon circumstantial evidence alone, but in such a case "all the circumstances proved must be consistent with each other and with the hypothesis that the accused is guilty, and at the same time incon-

sistent with any other rational hypothesis." (*State* v. *Suitor*, 43 Mont. 31, 114 Pac. 112, 116, Ann. Cas. 1912C, 230; *State* v. *Sieff*, 54 Mont. 165, 168 Pac. 524; *State* v. *Gomez*, 58 Mont. 177, 190 Pac. 982.)

Although the evidence may be sufficient to induce the conclu- ██ sion that the defendant is probably guilty, it is insufficient; to sustain a judgment of guilty, the evidence must establish guilt "beyond a reasonable doubt"; "there must be some substantive testimony to justify the judgment of the court." (*State* v. *McCarthy*, 36 Mont. 226, 92 Pac. 521, 523; *State* v. *Duncan*, 40 Mont. 531, 107 Pac. 510.)

As heretofore noted, the only distinction between the case ██ made against Bacon, as to whom the trial court held the evidence insufficient, and that made against McWilliams, lies in McWilliams' offer to pay for the wheat rather than stand trial, coupled with a denial that he took the wheat. This offer was made after the sheriff had told him that his truck had been traced both ways from the entrance to the field, and that imprints of the two tires on the truck were identical with the imprints left in the field. While ordinarily an intelligent man who is innocent would not care to evade prosecution by payment and thus leave a cloud on his good name, in the circumstances related the offer did not constitute a confession of guilt (*State* v. *Suitor*, supra; *State* v. *Dixson*, 80 Mont. 181, 260 Pac. 138), and can hardly be said to rise to the dignity of an admission against interest.

For the reasons stated, the judgment is reversed and the cause remanded to the district court of Fergus county, with instruction to dismiss the information.

Associate Justices Stewart, Anderson and Morris concur.

Mr. Chief Justice Sands, Dissenting: This is an appeal from a conviction of burglary of about sixty bushels of wheat from a granary in a field near Lewistown, the property of John Sampson. It appeared from the testimony that the granary was situated in a field about sixty rods from any other build-

ing. The defendant McWilliams, with a codefendant, Ralph Bacon, were charged with removing the property by means of a truck the wheel tracks of which were alleged to be proof of the commission of the offense by the defendants. The sheriff and several witnesses examined the tire tracks in the soft dirt of the field and on the roadway, and by means thereof the sheriff followed the truck to the home of the defendant some seven miles distant and thence six miles to a wooded area where the defendant was found with the truck gathering firewood. The sheriff told defendant of the burglary and of following the tire tracks, took the defendant in charge, and brought him to Lewistown. The defendant denied all guilt, but asked to have a private conference with the owner of the wheat, and thereupon offered to settle for the wheat, stating that it would be cheaper to pay for the wheat than to stand trial. He well knew that the chief evidence against him was the imprint of the tires in the soft dirt, but he made no effort to investigate the tracks to compare them with his truck and thereby establish his innocence. Later, when the case was tried, the sheriff and several witnesses testified that the imprint of the truck tires corresponded with the tires on the truck. Two witnesses testified that the defendants were seen returning with the truck in the early morning of the night in which the wheat was stolen. The defendant went upon the stand and disputed these two apparently disinterested witnesses, claiming that he had returned earlier in the night and gave some excuse for being so late in returning home that night. The majority opinion recites these circumstances more fully and concludes that the testimony was insufficient to sustain the verdict.

It is not my purpose to detail the circumstances of the trial. They are fairly stated in the majority opinion, but I cannot draw the same conclusions as in the majority opinion. I do not believe that the judges of this court are as well qualified to pass upon the truthfulness of the various witnesses as was the jury who met the witnesses face to face. There were twelve

jurymen and their verdict was unanimous. I do not feel justified in voting to set aside their verdict under the circumstances.

Second, I am fortified in this conclusion by the circumstances that the defendant, when he learned of the charge against him on the day following the burglary, was then in a position to demonstrate his innocence of the crime by having appropriate examination made of the truck tire tracks, but, instead of doing this, he offered to pay for the wheat. It seems to me that his offer was not consistent with his innocence, and his testimony on the trial was discounted by his failure to make adequate and timely efforts to prove his innocence. The rule is, of course, well established that it is the duty of the state to prove beyond a reasonable doubt the guilt of the defendant, but I cannot construe the rule to go so far as to permit a witness to go upon the witness stand even though he be a defendant, and testify to his innocence when he has the means at his command to unquestionably and with slight effort establish his innocence. His testimony, contradicted by the evidence of two distinterested witnesses relative to the time of his return on the night of the burglary, lends further ground for discrediting his testimony and the theory of the majority opinion that the verdict of the jury should be set aside could not meet with my approval.

It was the duty of the district court to see that the rules of evidence were carefully observed and that the jury was properly instructed. The duty of the jurymen was to render a verdict of not guilty unless convinced beyond a reasonable doubt from the evidence that the defendant was guilty. At the close of the state's case a motion was made to direct a verdict for the defendant upon the ground that the evidence was insufficient to sustain a verdict against him. Judge McConochie denied the motion. The majority opinion finds no error in the admission of evidence or the instructions of the court, but it does find that the jury and Judge McConochie did not properly weigh the evidence, and months after the crime was committed and miles from the scene and from the witnesses, this court now finds that there is not sufficient evidence to sustain the verdict,

and orders the defendant released and absolved from all liability. It amounts to a case of thirteen to four, with the opportunity of the thirteen to meet the witnesses face to face and to observe their demeanor on the witness stand and otherwise measure the merits of the case with greater precision than the four judges of this court upon the cold record.

In practically every criminal case the defendant claims the evidence was insufficient to sustain the verdict, and this court is asked to review and weigh the evidence. The duty of a supreme court is to examine the alleged errors of law in the lower court and any charge of prejudice of judge or jury or other error of law that might prejudice the defendant in the trial of his case in the lower court. The Constitution fixes the duty upon the jury to decide the facts, and this court should refuse to retry those issues of fact. Furthermore, I think it is quite unbecoming of the court to assume their superiority over the trial judge and the jury in view of the Constitution.

The record discloses that the defendant is married and has two children. No doubt that fact was rehearsed to the jury, and the trial judge was reminded of the injury that would arise if the husband and father is punished. The question of sympathy should not control or affect the question of the commission of the crime. A woman's tears and children's sobs have opened the doors of many a prison to turn loose smirking men who go forth to further prey upon society. The successful outcome in such criminal cases breeds confidence in the defendant, and he feels that his education acquired in this crime has taught him the schemes and technicalities that will free him in future contemplated violation of the rights of his neighbors. I think that the jury and the trial judge should be commended for their courage and judgment in this case. They would no doubt have preferred the thanks of the defendant and the family and friends for a different result. Let my dissent be recorded.