# STATE OF NORTH DAKOTA v. JACOB CHRISTMAN.

(155 N. W. 26.)

**Murder — manslaughter — conviction — appeal — error — rebuttal evidence — verdict — degree of proof.**

Defendant was tried for murder in the first degree for killing one Becker February 14, 1915. He was found guilty of manslaughter in the first degree, and sentenced to ten years' imprisonment, and appeals, assigning error in the exclusion of testimony offered, and challenging the sufficiency of the evidence to support conviction. Held:

That error was committed in the exclusion of testimony bearing on the issues; that the order of proof on the trial wherein what was properly a part of the main case of the state was permitted to be put in on rebuttal was prejudicial; that the verdict is not sustained by that degree of proof necessary

to sustain the conviction under the law, and the verdict and judgment thereon are, therefore, ordered set aside.

Opinion filed October 20, 1915.   Rehearing denied November 19, 1915.

From a judgment of conviction rendered by the District Court of Mercer County, *Hanley*, J., defendant appeals.

Reversed and a new trial is granted.

*Geo. I. Reimestad* and *Miller, Zuger, & Tillotson,* for appellant.

The homicide occurred in the defendant's dwelling, his home, and while the deceased was intent upon the commission of a crime.   His assaults upon defendant in the presence of defendant's wife and children and in their home had continued for some time.   Defendant had the right to protect and defend himself and his home; but there is no legal evidence of the commission of any crime by defendant.   People v. Tomlins, 213 N. Y. 240, L.R.A. —, —, 107 N. E. 496; Beard v. United States, 158 U. S. 550, 39 L. ed. 1086, 15 Sup. Ct. Rep. 962, 9 Am. Crim. Rep. 324; Runyan v. State, 57 Ind. 80, 26 Am. Rep. 52, 2 Am. Crim. Rep. 318; Hurd v. People, 25 Mich. 405; Morrison v. Com. 67 L.R.A. 541, note; Staten v. State, 30 Miss. 619; Cochran v. State, 28 Tex. App. 422, 13 S. W. 651, 8 Am. Crim. Rep. 496; Richardson v. State, 7 Tex. App. 486; State v. Haslet, 16 N. D. 426, 113 N. W. 374; Smith v. State, 68 Ala. 424.

Deceased was in the attitude of an assailant upon the defendant in his own premises.   The right of self-defense sometimes implies the right of attack.   One who has reasonable ground to believe, and does believe, that another intends to do him great bodily harm, need not wait until such other gets the advantage of him, but may act at once.   State v. Matthews, 148 Mo. 185, 71 Am. St. Rep. 594, 49 S. W. 1085, 11 Am. Crim. Rep. 681.

*John L. Cass,* State's Attorney, and *H. L. Berry,* Special Prosecutor, for respondent.

There was a sufficient showing of circumstances in this case for the jury to find that the shooting was in the heat of passion.   People v. Poole, 159 Mich. 350, 134 Am. St. Rep. 726, 123 N. W. 1093; State v. Bulling, 105 Mo. 204, 15 S. W. 367, 16 S. W. 830.

Goss, J. The defendant was informed against, and tried for murder in the first degree, and convicted of the included offense of manslaughter in the first degree, and sentenced to ten years' imprisonment. The appeal raises questions of error in the admission of evidence and instructions, and it is also strenuously urged that the verdict is contrary to law and insufficient to sustain the conviction.

The homicide occurred February 14, 1915, within the dwelling house of the defendant, where Henry Becker was killed by a gunshot wound. The defendant was fifty-seven years of age. Becker, the deceased, was a young, vigorous, and athletic man, much larger, heavier, and stronger than defendant. Deceased was a trespasser in defendant's dwelling, where he met his death, and at the time he was shot he was, or shortly prior thereto had been, mauling and terrorizing defendant, who, to protect himself from Becker, had taken his shotgun, loaded it with a shell, and awaited another onslaught. On arrival at the house about dark, Becker had forced entrance into the house by pushing the door open while the wife of defendant was doing her utmost to hold it shut and keep him out. This, the state questions, but there is no foundation in the record from which to successfully challenge the fact. Becker was under the influence of liquor. Earlier that afternoon, an hour or two before, he had followed Christman into the house of a neighbor, John Pfennig, tried to provoke a fight with defendant, and there accused Christman of giving his mother a bad name, pulled off his sweater, and, in the presence of Mrs. Pfennig and her children, committed an unwarranted assault and battery upon him, striking and cuffing defendant, who seemed powerless to protect himself, and who, to escape, fled from Pfennig's house, and, running to the rig of Albert Krukenburg, ordered him to drive him home, stating to Krukenburg at that time, "Oh God! They almost killed me. Drive as fast as you can; he will shoot us both dead." What transpired in Pfennig's house is testified to by Mrs. Pfennig, as well as by defendant himself. Her testimony corroborates his throughout. The state would treat this assault as a trivial matter, but it is important as indicating the frame of mind in which it left the defendant, as being in abject terror of Becker. John Pfennig was not in the house, but soon after the occurrence saw Becker, who went into the house with him, and said: "I gave it to Christman." He later asked Pfennig to take him over to Christman's because "he wanted to

fix it up with Christman." Pfennig smelled liquor off Becker's breath. He also saw Christman running fast some fifty or sixty steps or more, when escaping from Becker and into the sleigh of Krukenburg. Pfennig and wife are witnesses for the defense and Krukenburg for the state.

Earlier events that day should here be narrated. While defendant was at his home at 10 or 11 o'clock that Sunday morning, Becker and Krukenburg drove up and entered Christman's house. Christman was about to take Phillip Werner home, some 4 miles away. Becker volunteered to take Werner home. Before leaving, Krukenburg asked for some alcohol for his sick wife, and some was given him. Becker demands a bottle of it, as his children had a cough, he said. This, Christman refused, but, evidently to avoid trouble, Mrs. Christman put some alcohol in a catsup bottle, which she gave him. The four men then left for Werner's. On the way back the team ran away when near Pfennig's. There is some conflict in the evidence as to who was driving when this occurred. The defendant thinks that Becker was driving just before that, and, because he was driving too fast, Krukenburg took the reins from Becker, who then stood up and swung his arms to frighten the team. Krukenburg says that he was driving; that Becker had gotten out of the rig some little time before, and fallen down and just overtaken them shortly before the runaway, which he says was occasioned by the whiffletree coming loose. A fair inference is that all three were more or less intoxicated. Defendant was greatly excited by the runaway, and left in fright for Pfennig's house, where subsequent events there left him in great fear of Becker doing him serious bodily injury. This is borne out by the fact that he required Krukenburg to drive him home without waiting for or allowing Becker to come along, as Becker was purposely left behind at Pfennig's. Defendant testifies that when he got home just about dark he was cold and immediately went to bed, his wife assisting him, and he fell asleep.

The wife testifies:

Q. And how long after your husband returned did Henry Becker come?

A. I had just put my husband to bed, to sleep, when I come out of the room and saw Henry Becker coming.

Q. About how long was that?

A. About five minutes.

Q. Henry Becker came into the house?

A. Yes, he came in. I did not want to let him in. I was afraid of him, and I held the door and he pushed the door against me and came in.

The witness had already testified that when she saw Becker coming she got frightened and that she held the door shut, because she was afraid they would get into a quarrel.

She was then asked by defendant's counsel:

Q. Had your husband told you before that that Becker and he had had some trouble?

On objection made, witness was not allowed to answer this question. It was error not to permit this answer. The wife then testifies that when Becker entered the house "he took father at the throat and dragged him around." She also says that Becker was raving around the house, had his shirt open; that Becker said he "wanted to shed blood on Christman's place this evening," and "they were pulling one another around and then I went away to get help." She went about a quarter of a mile to where Jacob Christman, Jr., a married son of defendant, lived. What she said there was stricken out of the record, but the wife hastily returned home, followed by her daughter-in-law, who took another and nearer route back to defendant's dwelling. The mother arrived a very short time before the daughter-in-law, although the two evidently arrived almost simultaneously. Becker was just coming out of the bedroom into the kitchen, and stood in front of the kitchen table, and asked the wife, "Why did she call Anna." Anna, arriving on the scene at this moment, Becker turned to her, and asked Anna why the old lady had "called Jacob, what we wanted of him," quoting from her testimony. And Anna inquired, "What have they [Becker and defendant] got all day with one another?" At that instant a shot came from the bedroom, where defendant was holding a shotgun, the charge from it killing Becker instantly. In the room at the time were the two women, two children, and Becker. The room was 11 x 13 feet. The shot came through a doorway. The muzzle of the shotgun was within 20 feet from Becker when he was shot. The charge entered his head from nearly front and above the left temple. His head was partially turned to the left, so that the charge did not come directly from the front, but

entered from a point an inch or two above the outer corner of the right eye, blowing his brains out. Defendant removed the body to without the door, leaving it upon a sort of dirt porch at the entrance. Neighbors came, among them, relatives of Becker. They remained in the house until toward morning. One of them, Mrs. Morast, testifies to a narration of events made during that period by defendant's wife, and not in the presence of the defendant. The foregoing are the facts briefly stated.

The defendant testified. He admits holding the gun at the time its discharge killed Becker, but claims it was fired accidentally, and while he was holding it in anticipation that Becker would again attempt to do him bodily harm, in which event he would have shot him, as he was in terror of Becker. That he did not know the women had returned. That he had sent his wife for his son Jake for help. But the wife says that she saw help was needed and went on her own accord. Defendant says that while she was gone he took the crying baby out of the cradle, and held it in his arms and lit the lamp, holding the baby, thinking that Becker would not assault him while he had the child in his arms. Afterwards he put the baby down and managed to get hold of the shotgun. He attempted to get out through a window, but found the window was nailed in. His boy, Phillip, eight years old, was in the bedroom with him, crying. That he ordered Becker out of the house; that Becker did not go, but replied that "he wanted to make it good again," evidently desiring to make it up with the defendant, who replied saying, "No, this time you go to court." That soon the gun went off accidentally as defendant closed its breach. Defendant testifies to its having before this accidentally discharged that way, on account of the firing pin striking the cartridge and exploding it in closing the breach. The gun is in evidence and seems strongly to bear out defendant's contention that it can be accidentally discharged very easily. Defendant admits placing the cartridge in the gun and holding it with the breach open in readiness, believing that Becker would attack him again, when he intended to use the gun on Becker, although he had no intent whatever to shoot him at the time the gun was discharged. That some little time before the shooting Becker had said to him: "You old dunder-weather! If you don't want to fix up with me, I will give you your share."

The state's case was largely put in on rebuttal and in a way that was

clearly very prejudicial to the defense. The witness Krukenburg was not called until in rebuttal, and was allowed to narrate occurrences from the morning until the evening, nearly all, if not all, of which was more properly a part of the state's main case, and all of which was received over objection as improper rebuttal. This witness, besides corroborating the defendant as to his request to Krukenburg to "drive as fast as you can, he will shoot both of us dead," also states that defendant said when leaving Pfennig's: "It may come as ever it wants to, I will shoot Henry Becker down," a statement that does not at all fit in with the conduct, situation, and circumstances of a man in defendant's position, trying to get home and out of danger, and fleeing from an assaulter and at a time when he was unmistakably in terror of him. Much is made by the state of this statement, which together with the testimony of Mrs. George Morast, also introduced on the state's rebuttal, constitute the most damaging testimony against the defendant and that upon which the jury must have based conviction. She testified in rebuttal to having entered defendant's house about ten o'clock that evening and to having stayed there until half past three and that during said period she was sitting on a bed near the wife of the defendant. The following is her testimony: "Q. At that time there did she (Mrs. Christman) use the following words in speaking to you and Mrs. Buechler (sister of deceased Becker) 'My husband was sitting on a chair in the kitchen and he got up and went into the bedroom and I thought he was going to get his tobacco, but he got a cartridge from the clothespress and then he shot.' " A. "She said everything but I don't know if he was sitting or standing." Q. "At that time did she use substantially the following words in speaking to you and Mrs. Buechler 'My husband was sitting on a chair in the kitchen and he got up and went into the bedroom and I thought he was going to get his tobacco but he got a cartridge from the clothespress and then he shot,' or words to that effect?" A. "She said everything, only she did not say if he was sitting or if he was standing."

The state has very ingeniously briefed this case. It has used as much cleverness in its endeavor to sustain this verdict as it used in obtaining it, but in its brief are found many statements either without or contrary to the record. On the first page of the brief is found the following statement, wholly unwarranted and without any foundation in the record: "Defendant is known to his family as a man of violent and revengeful

nature, hasty temper and one who threatens to shoot on the slightest provocation." Again, on page 17 it reiterates: "Defendant always threatens to shoot on the slightest provocation and his family knew it." There is no evidence of this. Again is found in the brief: "While riding along with Albert Krukenburg the defendant told him 'it may come as ever it wants to, I will shoot Henry Becker down.' " Counsel is within the record in making this statement, but a few lines later he follows it with this: "No one knows what he told his wife, but in all probabilities he told her what was in his mind, namely, 'It may come as ever it wants to, I will shoot Henry Becker down.' " In fact the wife was not permitted to testify to what defendant told her when he came home. To support her testimony that she was frightened at Becker's arrival soon after her husband had gone to bed and as supporting her declared reason why she held the door shut against Becker's entrance, she was asked: "Had your husband told you before that that Becker and he had some trouble?" Mr. Berry: "Objected to as calling for the conclusion of the witness, not admissible in evidence and self serving." "Sustained." "Exception." Defendant, relative to this incident, had previously testified as follows: "When you got home, what did you do?" "I said to my wife that I got a beating from Henry Becker and it was worth my life that I was in Pfennig's house; otherwise, he would have killed me. I asked my wife to fix up my bed. I was freezing. And she done it and I told her I was awfully tired." "Did you go to bed right away?" "Yes." The exclusion of this testimony, offered by the wife as sustaining her husband's testimony, and explaining her own conduct in refusing Becker entrance, was prejudicial error. But the statement above quoted from the state's brief is contrary to what the record shows was told his wife, so far as that was permitted to be shown.

The brief of the state is again quoted from: "The theory of the state is that Mrs. Christman went to get help to save the life of the man who wanted 'to make it good again' and to keep her husband from doing what he had threatened to do, namely, shoot Henry Becker down. Mrs. Christman returned before Anna and had been at home ten or fifteen minutes before Anna arrived. During her absence the light had been lit and placed on the table in the kitchen. The whole family were sitting in the kitchen with Becker where the light was lit and everything

was peaceable, excepting the mind of the defendant. Then the defendant got up from his chair in the kitchen and went into the dark bedroom and from the sound his wife thought he was going to get his tobacco, but he must have got a cartridge from the shelf. The defendant being in the heat of passion loaded his shot gun and while they were peaceably talking, the deceased was shot by the defendant from the dark bedroom. One of the last things he said to Anna was 'I want to make up with the old man and he won't let me.' " This theory of the state is largely contrary to and unsupported by the evidence. Under the facts no such period of time elapsed after Mrs. C. returned before Anna's arrival. That she left for help in order to save Becker from her husband is flatly contrary to all the evidence or any reasonable deduction from it. The evidence tending to substantiate the statement that all was "quiet on the Potomac" consists almost entirely of the statement of Mrs. Morast, which was admissible for no other purpose than to impeach the testimony of Mrs. Christman. It is admitted by the state in the record that any statements Mrs. Christman made to that witness were not made in the presence of the defendant and are not, therefore, substantive proof of the actual conditions surrounding the shooting. The state cannot avail of such statements to sustain its theory, where it could not prove its case in the first instance by said statements. Except for impeachment purposes, they would have been excluded as purely hearsay.

And prejudicial error was committed in excluding Mrs. Christman's answer to the question asked her by defendant's counsel: "Why did you go away to get help?" That it would tend to disprove the theory of the state that she went to save Becker from her husband sufficiently demonstrates that she should have been permitted to give her reason for acting as she did. Her answer might have had an important bearing on the result. Especially so if the same argument was made by the state to the jury as is made in the state's brief on this appeal. This error alone would justify reversal. And it was error not to permit Mrs. Pfennig to state of what she was afraid under objection made and sustained.

The state would sustain conviction because defendant is impeached by Krukenburg as to who was driving before the runaway and some hours before the shooting. Though defendant was thus impeached it

32 N. D.—8.

furnishes no substantive proof of the situation of the parties at the time of the homicide or that the same was criminal.

On the whole the circumstances of this case strongly favor defendant. These two young men visited his home wholly unsolicited that Sunday forenoon. Becker succeeded in getting liquor, over defendant's protests, and evidently through the kindness of defendant's wife, who thought it better to give him some rather than run the risk of trouble with him. All left in good spirits and friendly. Hours afterward they round up at a neighbor's just after a runaway has scared the defendant, who recalled that a year or two before while Becker was driving a half a mile from that place a young man was killed in a runaway. Then defendant is unjustifiably assaulted in the presence of the neighbor's wife and within her house. Becker, not defendant, was the aggressor and was in an ugly frame of mind. He succeeded in greatly frightening defendant, even according to Krukenburg, who evidently is antagonistic to defendant. That the old man was still in fear is apparently shown by his insistence upon being taken home immediately, in his desire to keep away from Becker and avoid trouble and by Becker's being left behind. No matter what his mind was toward Becker apparently he was doing his best and all that he could do to avoid him; and he succeeded in doing so and reached his own home in safety, wherein he had a right to stay and to defend himself. Becker breaks into the house thereby evincing anything but an intent to be law-abiding or friendly toward defendant and his family and this too within a reasonably short time after defendant had been assaulted and maltreated by him in the neighbor's house. The state argues that because he expressed an intent to the neighbor to fix things up with the old man that he went down there only with intent to make his peace. But he had no business there, no matter what his motives were that afternoon. Nor does the fact that he was under the influence of liquor alter the situation in favor of the state. Rather the contrary, as a drunken man, ugly when drunk, may be dangerous and devoid of reason. The undisputed and accepted fact remains that almost immediately upon his arrival defendant's wife left for help, evidently to protect her family from Becker. Whether this was done on her own volition or at her husband's order is immaterial, except if by the latter, it tends to show that he at that time in good faith believed that help was necessary to protect himself and family from

imminent danger. And Becker was still there when the wife and assistance returned after she had run half a mile for aid; and at the very moment he is shot he is bullying the women by demanding why they went for help. Besides there is every reason to believe deceased had assaulted the old man before the wife left, just as she says he did. Otherwise, in all probability, she would not have gone or have been sent for help. And the testimony of the daughter-in-law is that on her return, in looking through a window, she saw these men, Becker and the defendant, scuffling and pushing one another around. Becker emerges into the kitchen just as she appears with help as he supposed. He was not in a very peaceable or a very pleasant frame of mind. He must have anticipated he would have to answer for his being there and for what he had done.

Another very important circumstance tending to sustain defendant's plea of self-defense is that there is wholly wanting any proof of incentive or motive on defendant's part for killing his neighbor. He had not enticed Becker to his home;—on the contrary he had fled there for refuge and to escape from him and in such a way as to prevent Becker from following him. No enmity is shown; on the contrary, that morning the two were friendly. At no instance had defendant been the aggressor. Always he had been the one imposed upon and abused. Conclusions ordinarily to be drawn would seem to establish the verdict to be contrary to the overwhelming weight of the evidence.

Some of the errors discussed are not saved by specifications and assignments of error. Decision does not turn on them nor upon any one ruling in particular. But from an examination of the entire record it appears that prejudicial error was committed in the order of proof on trial and on the exclusion of testimony having an important bearing upon the issues of fact involved; and that the guilt of defendant is not established to that degree necessary to authorize an appellate court to find it to have been found upon substantial, though conflicting evidence, and to its satisfaction: 12 Cyc. 731 C; Armstrong v. State, 17 L.R.A. 484, and note (30 Fla. 170, 11 So. 618); Hill v. State, 21 L.R.A. (N.S.) 878, and note (55 Tex. Crim. Rep. 407, 117 S. W. 134); 1 Hayne, New Tr. & App. § 97; Dickey v. Davis, 39 Cal. 565.

The judgment of conviction is set aside and a new trial granted.