# STATE OF NORTH DAKOTA, Respondent, v. KASIMER SCHNEIDER, Appellant.

(208 N. W. 566.)

**Homicide — evidence examined and it is held there is no reasonable probability that deceased committed suicide.**

1. In a prosecution for murder certain evidence relating to drugs possessed by a near neighbor of the defendant examined, and, for reasons stated in the opinion, held insufficient to show that there is any reasonable probability that the deceased committed suicide.

**Homicide — motive not essential; evidence in this case discloses notice.**

2. Though motive is not an essential element of the crime of murder, the evidence in this case sufficiently discloses a motive.

**Homicide — criminal intent inferred, when.**

3. Criminal intent is inferred from every wilful, deliberate and unlawful administration of poison resulting in death.

**Homicide — evidence held to sustain finding that accused administered poison to wife and caused her death.**

4. Evidence examined and, for reasons stated in the opinion, it is held sufficient to justify the jury in finding that the defendant administered arsenic to his wife and that she died as a result thereof.

**Homicide — court did not err in sustaining objections to certain offers of proof made by defendant.**

5. For reasons stated in the opinion it is held that the trial court did not err in sustaining objections to certain offers of proof made by the defendant.

**Evidence — rulings on admission of certain evidence held proper.**

6. Certain rulings on the admission and exclusion of evidence considered and, for reasons stated in the opinion held proper.

**Criminal law — court may vary order of proof.**

7. Section 10,821, Comp. Laws 1913, provides for the order of proof, and that, after defendant rests, only rebuttal testimony shall be offered, unless the court, for good reason, in furtherance of justice, or to cure an oversight, permits evidence upon the main case. This section does not deprive the trial judge of discretion to vary the order of proof, or to permit the state, after defendant has rested, to call witnesses to testify on a point which was prop-

---

Note.—(2) Motive as element of offense in homicide, see 13 R C. L. 761; 2 R. C. L. Supp. 80; 5 R. C. L. Supp. 708.

(3) Presumption of intention from proof of killing, see 13 R. C. L. 741 et seq.; 2 R. C. L. Supp. 78; 5 R. C. L. Supp. 708.

erly a part of the state's case in chief, without an affirmative showing of good reason therefor.

**Criminal law — remarks of judge in presence of jury held nonprejudicial.**

8. Certain remarks made by the trial judge in the presence of the jury, are held to be nonprejudicial.

**Criminal law — certain remarks by prosecuting attorney held nonprejudicial.**

9. For reasons stated in the opinion, it is held that certain remarks made by the special prosecutor, were nonprejudicial.

**Criminal law — held that certain requested instructions by defendant properly refused.**

10. For reasons stated in the opinion, it is held that a requested instruction by defendant on circumstantial evidence was properly refused.

Opinion filed March 29, 1926.

Criminal Law, 16 C. J. § 2093 p. 827 n. 14; § 2186 p. 868 n. 40; § 2271 n. 917 n. 67; § 2290 p. 929 n. 86; § 2294 p. 932 n. 17; § 2433 p. 1009 n. 6; § 2434 p. 1011 n. 19, 20; 17 C. J. § 3637 p. 295 n. 63; § 3638 p. 297 n. 20; p. 299 n. 31; § 3674 p. 331 n. 39.  Homicide, 29 C. J. § 61 p. 1087 n. 59; 30 C. J. § 347 p. 140 n. 50; § 448 p. 219 n. 67 New; § 531 p. 287 n. 60; § 539 p. 295 n. 9, 15; § 542 p. 298 n. 47; § 557 p. 310 n. 25.

Appeal from the District Court of Barnes County, *Cole,* J.

Kasimer Schneider was convicted of murder in the first degree, and he appeals.

Affirmed.

*Norton & Kelsch,* for appellant.

*F. E. McCurdy,* State's Attorney, and *John F. Sullivan,* Special Prosecutor, for respondent.

ENGLERT, District J.   The defendant was charged in the district court of Burleigh county, with the murder of his wife, Amelia Schneider by the administration of poison.   On his application the case was transferred to Barnes county, North Dakota, some 140 miles from the city of Bismarck.   The jury found him guilty of murder in the first degree.   He appeals from the judgment of conviction and from the order denying a new trial.

Defendant is about forty-five years of age, and had been previously married.   An infant child, the issue of the first marriage survived.

Defendant and Amelia married on December 5, 1921, after an acquaintance of only three days. After marriage they took up their abode at his home in Bismarck and continued to reside there until her death on June 15, 1922. At the time of her death Amelia was twenty-five years of age.

The defendant challenges the legal sufficiency of the evidence.

This requires a statement of some of the more important or substantial facts developed by the state. The transcript contains over seven hundred typewritten pages of evidence. To state more than a mere synopsis of the same would require too much space.

The evidence shows that the deceased, at the time of her marriage to defendant on December 5, 1921, was a "strong and healthy" girl. During the latter part of said month, she was examined for life insurance, accepted, and a policy of insurance was issued to her by the Yeomen Lodge, for the sum of $2,000, payable to the defendant.

The mother of deceased was staying at the Schneider home, during the last week in March and first week in April. Amelia became very sick and started to vomit. The mother wanted defendant to call a doctor, but he refused. He told her if Amelia did not get better by morning, that he would call a doctor.

At that time, deceased was quite sick for about three hours, and her mother applied whatever "remedies" she knew of, and did everything she could to relieve the pain. "The next morning she was all right, and I took her along,"—having reference to the taking of Amelia home with her. She was at the mother's home for ten or eleven days, and while there, Amelia "wasn't sick."

Some time after Amelia returned to her home, her mother Mrs. Schitz being informed that Amelia had another one of those so-called "spells," sent another daughter to be with Amelia. About this time, defendant came to Mrs. Schitz's home, and when asked why he did not bring his wife with him, he replied that on getting back home, "I will send her over, and she can stay."

He was then asked whether he had had a doctor for Amelia, and he answered, "yes." "He says, Dr. Lipp, the doctor, says she got spells, and is going to get seven spells, and if she lasted through the seven, she will be free, but I don't think she will pull through."

He told her that he was giving Amelia soda. He left for home the

next morning. On leaving, Mrs. Schitz told him that she was "home-sick for Amelia," and wanted him to send her. The next time she heard of Amelia was after her death. She left at once for Bismarck, and on reaching the Schneider home, she asked him for Amelia, and defendant told her that she had been taken away by the undertaker.

On inquiry as to whether he had sent for a priest before she died, he said that he had not. Then, asked whether he had sent for a doctor, he answered, "No." She wanted to know whether he had anybody there with her, and he said, "No." Mrs. Schitz then wanted to know why he didn't let her know, and he said that he had phoned her, and that he talked with her personally. She then wanted to know if he did not know that she never talked "over the phone," and he said that he paid no attention thereto.

She then wanted to go and see Amelia at the undertaking parlors, and he told her, "They won't let you in, so I didn't go down." He then told her that because of Amelia's insurance, he was going to get into trouble. She wanted to know why, and he replied, "Because they sent a piece of her liver away."

Mrs. Lena Schwahn testified that she learned of Amelia's illness in the early part of April, 1922, from defendant. He was asked whether he had gotten a doctor, and after saying that he had not, he was asked: "Why don't you call a doctor?" He replied, "There is no use to incur that expense, she won't live anyhow." He also told them that he knew "just as much as the doctors do." That while she was at the Schneider home, Amelia drank water, and then "vomited quite green." That defendant had inquired of her husband, Joseph Schwahn, in her presence, of the effect of sugar of lead on rats and dogs, and whether it would kill them. On being told that it would, and that a spoonful of sugar of lead would kill a man too, defendant replied that it would not.

The following day, he inquired about the poisonous effect of sugar of lead again, and the amount it would require to kill certain animals. The night on which Amelia died, Mr. and Mrs. Schwahn were over at the Schneider home from 7:30 to about 8:30 in the evening, and while there, no lights were lit. That Amelia was lying in bed, and that the defendant was the only person about.

The next morning at about six o'clock, the Schwahns were informed by the defendant of the death of Amelia.

They were close neighbors, and Mrs. Schwahn was the first outsider to arrive at the Schneider home on the morning of Amelia's death. She went to the bedroom, and found the deceased lying "on her back, with her hands nicely folded and her head a little to one side. She was nicely covered and the left hand just peeked out over the covers a little." She testified that she did not touch the body nor the covers. She asked the defendant about a doctor, and he replied, "what can I do with a doctor now?"

The testimony of Mrs. Schwahn is supported by the testimony of her husband, Joseph Schwahn, and while he went a little more into detail, it is not necessary to mention the same, except in two or three particulars.

In the early part of April, defendant asked Mr. Schwahn whether "sugar of lead is poison." When told that it was, defendant inquired, "Will it kill rats and dogs?" Schwahn said, "Yes, and men too." Defendant replied, "No, it will not." Defendant also said, "a teaspoonful will not kill a man."

Defendant told Schwahn six or seven times about his wife being sick, and when told to get a doctor, defendant said, "It's no use," and that the doctor had told him so. Defendant complained to Schwahn of his sexual relations with his wife, in language not necessary to mention. That defendant did not take his wife out, and that he went visiting without her.

Defendant had complained to this witness that in marrying Amelia, he was "beat," and that he blamed the parties that induced him to meet and marry her. When told that no one could force him to marry her, he replied that he wanted a home for his baby, but that "it has none."

On the morning of Amelia's death, he was the second person to arrive at the Schneider home. He described the appearance of the body in bed and the neatness of the bed clothes, and the general arrangements, in the manner described by Lena Schwahn.

On the evening of the inquest, defendant told this witness: "I suppose this is going to cause me a lot of trouble." Schwahn asked why, and defendant said: "Well, because they sent this away;" "well,

I says, who told you this, because, I thought, if there is nothing wrong why should we have trouble." "He says, 'Well, if the neighbors don't help me, if they want me to go to the penitentiary, I am ready for it.'" After that, defendant asked Schwahn to find out from Dr. Lipp whether any report had come back from the University of North. Dakota, where the stomach, liver, and kidneys of deceased had been sent.

Several witnesses testified to statements made by the defendant during the spring of 1922, to the effect, having reference to his marriage with Amelia, that he was "cheated," and that he was "beat again." During the fore part of May, 1922, defendant told Frances Schitz, Amelia's sister, that Amelia was planting flowers "on his first wife's grave," and he told her, "he thinks she won't see the flowers any more because she will die before the flowers will bloom." That during the time Frances was there, defendant did not sleep with his wife, and that Frances slept with her. There were times when Amelia asked to sleep with defendant, but that he sent her back to sleep with Frances.

In the spring of 1922, defendant told Nels Anderson, that Amelia was sick, and that "the doctor had told him that she was incurable." About the same time, defendant told some witnesses that his wife had stomach trouble, others that she had cancer, others that she had womb trouble, others that she had "woman sickness," and others that she had "heart trouble." He claimed that Dr. Lipp had told him so.

Defendant told George Schneider, in the early spring of 1922, that Amelia was sick, and that she was going to have seven spells, and that the doctor had told him, defendant, that she would then die. Defendant said that he made his own medicine, and after describing some experiences therewith, this witness said he would like to see some of this medicine, and defendant told him that "he would let no man see it." Defendant then said that after his wife died, he was going to the old country. This witness and defendant are not related.

Defendant told Mrs. Veronica Walter, in the spring of 1922, that he would soon be a widower again; that his wife had "woman sickness," and that Dr. Lipp had told him there was no help for her.

Three days before Amelia died, Mrs. Anna Wenchel and her husband, called at the home of the Schneiders and went to Amelia's bedroom, where she was lying sick, and after asking whether they had

had a doctor, defendant said that they had had Dr. Lipp, and that "he just came in and turned her eyes open and said it's too late, she's going to die anyway." The evidence shows that Dr. Lipp had been there to see the deceased on April 28th, more than sixty days before the time spoken of by the Wenchels.

Defendant then said he wanted to take Amelia to the hospital, but that the doctor had told him "there's no use taking her up to the hospital and spending any money, because she have to die anyway." Mrs. Wenchel wanted to give Amelia some coffee or milk, and defendant declared that "the doctor said he couldn't give her milk." When told to get another doctor, defendant said "all the doctors don't know much." Defendant told her that Amelia's folks cheated him; that she was sick when he married her, and that she got sick every time he had intercourse with her.

In the early part of April, Emil Bobb was told by defendant that Dr. Lipp said Amelia was going to have seven spells, and if she pulled through those, she would be healthy again, but that he was afraid she would "not pull through." When told to get another doctor, defendant said there's no use, "they don't know anything anyway. I know just as much as they do."

On the morning of Amelia's death, this witness was told by defendant that his wife was either "dead or unconscious, I don't know which." Going over to the house, this witness and his wife, found Amelia "lying in the bed, all covered up nicely, and she was lying just like she was asleep, but she was dead." They arrived shortly after the arrival of Mr. and Mrs. Schwahn.

This witness, being employed in a furniture store, and in an undertaking parlor connected therewith, defendant asked him, after the autopsy, "every noon and every evening," whether any report on the stomach had come back from Grand Forks. After the autopsy, Mr. and Mrs. Bobb were over at the Schneider home, and he told them that he could not sleep; "I can't rest at all." He appeared restless, and walked back and forth in the room, and said "he was going to have so much trouble." By that time, he had disposed of all his furniture. "He talked about insurance, but I can't remember exactly what he said."

Defendant told Mrs. Emil Bobb that Amelia had terrible cramps

in her stomach, and that he thought she would not live. He told her that his wife had $2,000 insurance, payable to him.

A short time before his wife died, "he said that he was tired of everything, and he felt like taking a rope and hanging himself." After the post mortem, defendant asked her whether any report had come back from Grand Forks. In speaking of the insurance, he said "that he wished those apprentices down there would hurry up and send the stomach back, so he could get his insurance. He wanted to go to Roumania."

Defendant told Philip Stumpf that Amelia had cancer, and when told that she was too young to have cancer, he replied, "Yes, she is, but I know better." After the autopsy, he told this witness that since they had sent the stomach away, that he was going to get into trouble.

He told John Gress, a merchant at Sweet Briar, in connection with his marriage to Amelia, that he was "beat again;" that the doctor had told him that his wife had "heart trouble;" that the doctor gave no medicine, "because medicine wouldn't do her any good."

On the morning of the death of Amelia, H. J. Stolke, the county coroner, asked defendant whether he had had a doctor, and he replied that he did not "need any doctor." About two weeks after Amelia's death, this witness, in company with F. E. McCurdy and the chief of police, went to the Schneider home to look things over, and found that "everything was moved out of the house."

On April 28, 1922, defendant called Dr. G. R. Lipp, and he found Amelia in bed. The defendant did all the talking. The deceased said nothing. The doctor was told by defendant that his wife had had a spell, and "that she was over it now." When asked what she appeared to be suffering from, defendant said: "The only thing was that she had diarrhea and cramps." The doctor then requested to be called when she had another one of those spells.

At that time, to the doctor, Amelia looked physically "all right." He made no examination of her. He took defendant's word for what was wrong with her, and he prescribed accordingly. He left no medicine. The defendant did not have the prescription filled, nor was the doctor ever called for Amelia again. The doctor denied having told the defendant that she would have a certain number of spells, or

any spells at all, or that she was going to die, or that she was suffering from any of the ailments mentioned by defendant.

On the morning of Amelia's death, the doctor was called by Emil Bobb, and on arriving found that the covers "were very orderly drawn up on her chest," and her hands "were upon her chest, laid across her chest, above the covers." He arrived at the Schneider residence about 6 : 30 in the morning, and according to his opinion, Amelia had been dead for two hours. Rigor mortis had set in.

"I asked him why I hadn't been called, and he said he didn't know she was dead, and I walked out of the room to the waiting taxi, and somebody, I think Bobb, asked him if they could call the undertaker, . . . and I said they had better call the coroner." An autopsy was made, and the entire stomach, parts of the liver, spleen and kidneys were removed, and sent to the State Health Laboratory at the State University of North Dakota for examination.

Dr. George A. Abbot, head of that department, found that the stomach contained 4.72 grains of arsenic; he testified that two grains of arsenic dissolved in the stomach would kill an adult person; that the odor of lime and of mint was present in the stomach; that there was a small amount of calcium present; that during the war, a potato bug poison was developed, to take the place of high-priced Paris Green, and that such potato bug poison has calcium arsenic in it; that calcium arsenic was in common use in 1921 and 1922; that the proportion of calcium arsenic found in the deceased's stomach was approximately the same as that found in the ordinary potato bug poison; that it does not require any particular skill or knowledge of arsenic poison or its effects to administer it over a period of two or three months safely, without producing death.

The witness Clara Fisher, and defendant's first wife, were friends and companions. After her death, defendant interested himself in Clara Fisher. She was at that time employed at the home of one William Ode. She had been twice married.

While Clara Fisher was away in Minneapolis, and before his marriage to deceased, defendant inquired of William Ode for her address, wanting to write to her, with the thought of marriage in mind. Mr. Ode did not know her address, and did not know whether she would return. After his marriage to deceased, Clara Fisher returned to the

Ode home, and while employed there, defendant called on her on various occasions.

On the question of why he wanted her address, she was asked, "Did he say what he wanted to find you for?" "Yes, he wanted to marry me before he married that second wife."

Concerning other visits and meetings, she testified that "every time he would meet me he would ask me to go out with him, go walking, and I says I don't want to go out walking with you, you have got a wife, . . . you should stay with your wife." He told her he could see no reason why she could not go out with him.

Later, she went to work in the Wilson home, just across the street from the Schneider home, and one evening, while sitting on the Wilson porch, defendant called her over to his porch. "I went over there, and I says, 'What do you want?' and he says, 'I want you to come and keep house for me and sleep with me at the same time,' and I says, 'Where is your wife?' and he says, 'She is in bed sick.' I says, 'What's the matter with her,' and he says, 'every time he had intercourse with her, she has been sick for seven days, and that he was getting tired of her, and he was going to get rid of her, and he says, if the people don't find out about the stuff he was mixing up in a little mint and giving it to her, and she is going to die,' and I says, 'how do you know she is going to die,' and he says, 'I know she is going to die, because I am going to get rid of her just as soon as I can.' "

This conversation took place a day or two before Amelia died.

About 11:30 that night, when Mr. Wilson returned to his house, she told him what the defendant had said. She was told to keep her mouth shut. "Then in the morning I got up and went down and told Mrs. Schubert about it, the same morning she died I went down there and told her."

A number of other witnesses testified, but their testimony would be merely cumulative of what was testified to by many of the witnesses, except that of Clara Fisher.

The defendant did not take the witness stand. Witnesses in his behalf testified that they saw or heard no quarrels between the defendant and deceased. Some of the state's witnesses, including deceased's relatives, testified likewise on cross examination. It was also shown

that defendant evinced grief and wept at his home, and at the funeral of his dead wife.

There was evidence to show that defendant had stated that Amelia. made a good mother to his child, and that he was well pleased with her. The evidence also showed that he did not solicit the insurance on his wife's life, but that one Matt Senger, corresponding secretary for the Yeomen Lodge at Bismarck, solicited it and paid for the medical examination, and the first monthly instalment of insurance premium, in the sum of $2.40.

The contentions on the alleged insufficiency of the evidence can be disposed of under four heads, and most logically in the following order:

First, that the evidence tends to show that the deceased committed suicide.

Second, that the evidence does not disclose a sufficient motive.

Third, that the evidence does not establish a criminal intent, and

Fourth, that the evidence is not sufficient to show that the defendant administered the poison to the deceased.

1. On the question of suicide, it is argued that because Joseph Schwahn had a medicine cabinet, in which he kept various medicines, and among them were some kinds of poison for family use, such as sugar of lead, iodine, lysol, carbolic acid and cresol, that deceased might have procured some of it, and therewith committed suicide.

The Schwahns and Schneiders were close neighbors, and visited back and forth frequently. Deceased was over at the Schwahn home, now and then, during March, April, May and June, of 1922.

The Schwahns also had some Paris Green, and some muriatic acid in the barn. The muriatic acid was used for soldering purposes.. There is no claim that deceased ever went to the barn. The evidence also shows that the last time deceased was over at the Schwahns' place, she was not in the house, but remained and visited in the front yard.

There is nothing in the evidence to show that deceased ever examined the medicine cabinet, inquired about it or its contents, or that she knew there was such a cabinet. The evidence shows that there was no arsenic in the medicine cabinet. The deceased died from arsenic poisoning. This is conceded,

But there is no evidence on the question of suicide at all. The

claim is based on speculation. It is all founded on surmise and conjecture.

From the fact that she was ill, more or less, from April to June 15th, the time of her death, and that during said time she had several sick spells, it is deduced that she committed suicide, and thus ended her suffering. But there is no evidence in the case to support such conclusion.

She had her first sick spell in the early part of April. At that time, her mother was visiting at the Schneider home, and what happened then, is narrated in the statement of the evidence. After going to the farm with her mother, and remaining there for ten or eleven days, she had no sickness or spells.

In this connection, it is also argued that because Amelia did not complain to neighbors and relatives, tends to show that she took her own life. If any deduction can be made from the evidence on that subject, only one conclusion can be reached, and that is: that deceased was unsuspecting, and that the defendant was her spokesman. This is evident from the testimony of Mrs. Wenchel.

On the night of her death, no lights were lit while visitors were there in the evening, up to 8:30, when they left. She died in bed unattended. There is no evidence that she left her bed that night. Whatever evidence of struggle there might have been was cleared away. The manner and method of her arrangement in bed, and the covers over her, and the position of her arms, would indicate that the defendant prepared her for the coming of his neighbors. He then announced to some that she was dead, to others that she was unconscious, and to others that he did not know she was dead. We are satisfied that there was no evidence of suicide in the case.

2. It is claimed that the evidence does not disclose a motive for the commission of the crime charged.

It is argued that the evidence is largely circumstantial, and that it does not disclose a motive and that therefore the verdict cannot stand. It is true that cases are not lacking where the evidence was so weak, whether direct or circumstantial, and no motive shown, that a reversal was ordered. State v. Rathbun, 74 Conn. 530, 51 Atl. 540; State v. Suitor, 43 Mont. 31, 114 Pac. 112, Ann. Cas. 1912C, 230, and cases cited in note.

The case of State v. Suitor, supra, is one of the leading cases on the subject. The rule is there epitomized, in the syllabus, as follows:

"While proof of motive is not essential to a conviction on the charge of murder, if the facts otherwise tend to show the commission of the crime, yet the presence or absence of a motive may be significant in the light of the facts of the particular case."

Here we have the direct evidence of Clara Fisher, in addition to the other evidence on the subject.

Counsel cite the case of State v. Christman, 32 N. D. 105, 155 N. W. 26, which is in harmony with State v. Suitor, supra. But the case of State v. Christman does not hold that motive is an essential element of the crime of murder, but is in accord with the prevailing rule that the presence or absence of motive is often helpful in determining whether or not the crime was in fact committed.

Here the evidence shows that the marriage was one of convenience, and not of love. That defendant felt "cheated" and "beat" in his marriage with the deceased. He was disappointed and dissatisfied with her, and spoke very ill of her. She had $2,000 of insurance, payable to defendant, and he appeared anxious to collect it, after her death, so he could go to Roumania, where he wanted to live.

On evidence less substantial than that in the case at bar, the Court, in State v. Whitbeck, 145 Iowa, 29, 123 N. W. 982, said:

"It is said there was no evidence of motive, and it may be conceded that no motive adequate to prompt the defendant to commit the act, if a mind of ordinary instincts is shown, but it does appear that defendant on two or three occasions disclosed a deep-seated hostility of feeling towards his father, though this was, so far as he indicated, not based on any wrong or injury, either real or fancied. The relations between the father and son appeared not to have been cordial, although they had not, so far as the evidence indicates, been hostile. Motive is not essential to be shown in such a case, although the absence of it may very well have weight with the jury in estimating the credibility of the evidence."

Though motive is not an essential element of the crime of murder, the evidence in this case sufficiently discloses a motive.

3. It is claimed that the evidence is not sufficient to establish a criminal intent.

Our statute, § 9469 of the 1913 Compiled Laws, makes a homicide, murder in the first degree, when it is committed by the administration of poison.

Section 9464 of the 1913 Compiled Laws provides that "a design to effect death is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed."

A criminal intent to kill is inferred from every wilful, deliberate and unlawful administration of poison, resulting in death. It is a rule of universal application, that every sane person is presumed to intend the natural and probable consequence of his deliberate and unlawful acts.

4. This, then, logically, brings us to the fourth contention that there is no sufficient legal proof in the evidence that the defendant administered the poison to deceased.

It is the claim of the defendant that there is no direct evidence, connecting him with the administration of the poison to deceased, unless the testimony of Clara Fisher is to be believed. It is argued, that her testimony is not worthy of belief because she was impeached as to chastity, and contradicted in some of her evidence; and one witness was of the "opinion" that her reputation for truth and veracity "is not very good."

While she is contradicted and impeached in some respects, she is also corroborated and supported in many material particulars, by witnesses both for the state and defendant.

The attack on her character for truth and veracity is very meager and by only one witness. There is also but little testimony on the question of her bad character for chastity and morality. One witness that testified thereto, carried considerable ill will towards Mrs. Fisher, and partly because of other court proceedings.

It is apparent that the jury believed her testimony, in spite of the attacks made thereon. State v. Keck, — Iowa, —, 206 N. W. 280.

The case was tried in a county far removed from the scene where the death occurred, and there is no showing, and there is no reason to believe, that the jury was actuated by passion or prejudice.

Taking the record in its entirety, we are not prepared to say that the evidence as a whole, is not sufficient to warrant fair minded men reaching the conclusion that the defendant administered the poison to

deceased, resulting in her death. No fair minded person can say, from all the evidence in this case, that the testimony of Clara Fisher is so inherently improbable, or so unreliable, as to make it unworthy of belief. Defendant's own acts, statements and declarations are exceedingly incriminating.

The court, under the law, determines whether there is any substantial evidence in the case on which a verdict can be based. But, if there is such evidence in the case, then, it is the province of the jury to determine the weight and credit to be given thereto. State v. Gummer, 51 N. D. 445, 200 N. W. 37.

5. Objection was sustained to an offer by the defendant to prove "that the deceased did not wish to have any babies and that she took medicine to prevent her having babies, and to prevent pregnancy;" and to an offer to prove that the bedding on the bed in which the deceased was lying while sick in May, 1922, indicated that the deceased had had a miscarriage. It was offered to prove this by two women residing in the neighborhood. In our opinion the objections to these offers of proof were properly sustained. The relevancy of the proffered evidence is not apparent. The evidence, if admitted, would not have established any fact material in the action, unless it were supplemented by further and additional evidence. And in ruling on the offers of proof the court, of course, was justified in assuming that they included all of the evidence which the defendant would be able to produce on the particular subjects to which the offers related.

6. Error is also assigned upon the exclusion of an offer to prove that the deceased "took medicines that were recommended to her by the neighbors for the sickness which she then had, and that as a result of the taking of these medicines she became more ill than she had been before taking the medicine." There is not even a suggestion in the offer of proof that these medicines were poisonous. The defendant in this case was charged with administering arsenic to the deceased, and the evidence shows beyond all question that the deceased died from arsenic poisoning. The relevancy of the evidence offered is not apparent. No error was committed in the exclusion thereof.

7. After the defendant rested his case, the state called Mr. and Mrs. Schwahn and Mr. and Mrs. Bobb, in rebuttal, to testify that they saw Clara Fisher at the defendant's residence a night or two before

the death of Amelia Schneider. This was objected to on the ground that the evidence "was properly a part of the main case, instead of a part of the rebuttal."

A motion to strike the evidence for the same reason was made and denied.

It is argued that because this evidence was properly a part of the state's main case, and not proper rebuttal, and not offered to cure an oversight, that the receiving of this evidence and the refusal to strike it on motion, amounts to reversible error.

Section 10,821, Compiled Laws 1913, providing for the order of proof, is cited.

Subdivision 4 of this section provides (after defendant rests his case) :

"The parties may then, respectively, offer rebutting testimony only, unless the court, for good reason, in furtherance of justice, or to cure an evident oversight, permits them to offer evidence upon their original case."

New York has a statute like ours on the subject, and the court of appeals, in People v. Koerner, 154 N. Y. 355, 48 N. E. 734, said:

"On the trial, after the defendant had rested, the prosecution was permitted to introduce the evidence of two witnesses as to the transaction which resulted in the death of the deceased. It may be conceded that the evidence might more properly have been produced by the prosecution and made a part of its evidence in chief. The contention of the appellant is that the court had no right to admit this evidence after the defendant had rested, and that it constituted an error for which the judgment should be reversed. As sustaining that contention, he relies upon § 388 of the Code of Criminal Procedure. That section provides: '. . . (3) The parties may then, respectively, offer rebutting testimony, but the court, for good reason, in furtherance of justice, may permit them to offer evidence upon their original case.' The appellant argues that, as a matter of law, the prosecution had no right to introduce this evidence, and that the court possessed no authority to admit it, unless it was affirmatively shown that there was some good reason, in furtherance of justice, why the evidence should have been admitted at that time. The provisions of § 388 are a mere formulation of the rules which previously existed in regard

to the order of proof in civil and criminal cases. But it has always been regarded as within the discretion of the courts to vary those rules. That in this case the learned judge was authorized to exercise his discretion upon the question of whether the evidence of these witnesses should be admitted, at that stage of the trial, there is no doubt, unless his discretion was abused, it constitutes no error. Leighton v. People, 88 N. Y. 117. In the case cited, it was held that upon the trial of a criminal action, it is in the discretion of the court to allow the prosecution to give evidence in aid of the case already made, after the defense has rested, although the evidence is in contradiction of matters sworn to by the prisoner. While it may be properly said that if the testimony of those witnesses was known and understood by the district attorney when he rested, he should have called them as witnesses before that time, yet it was discretionary with the court to permit their testimony afterwards, and we find nothing in the record sufficient to justify this court in holding that there was an abuse of that discretion."

This holding was quoted with approval in People v. Benham, 160 N. Y. 402, 437, 55 N. E. 11.

In the present case, we are not dealing with one of those instances where the state purposely withheld damaging evidence until the defense rested, and then offered it under the guise of rebuttal. But it is said that this evidence was offered in rebuttal, and therefore comes within that principle.

Here, the witnesses called in rebuttal had all testified for the State before. No claim of bad faith is made, and certainly none appears. It is apparent that the witnesses were called in good faith for rebuttal purposes, and the trial court so received them.

All of the witnesses testified only to having seen Clara Fisher at defendant's residence a night or two before Amelia's death. The fact that both the state's attorney and the trial court thought it was proper rebuttal testimony, when it should have been offered and received as part of the State's case in chief, does not make it reversible error, unless the trial court abused its discretion.

California has a statute like ours. In the case of People v. Whitlow, 24 Cal. App. 6, 139 Pac. 826, the people's counsel offered evidence in rebuttal, and the trial court thought it was rebuttal evidence and so

ruled.   It developed to be corroborative evidence, and should have been offered as a part of the people's main case.

The court of appeals, in dealing with this statute, held that while the trial court was in error in ruling that the evidence was rebuttal testimony, when it was properly a part of the people's main case, it was not such error as would justify a reversal.

This case was approved by the court of appeals in a later decision. People v. Wong Hing, 28 Cal. App. 230, 151 Pac. 1159.   This case presents a very full discussion of the subject, and reviews and cites many other California cases.

Iowa has a similar statute and the supreme court said, in the case of State v. Yetzer, 97 Iowa, 433, 66 N. W. 737:

"It is urged that the testimony was not proper in rebuttal, and to test the correctness of the position the query is put: would such evidence have been proper in chief on behalf of the state?   We have no doubt that it would.   But, considering that the evidence was not strictly rebutting, the court did not exceed its proper discretion."

See also State v. Holter, 30 S. D. 353, 138 N. W. 953, and State v. De Hart, 38 Mont. 211, 99 Pac. 438.

On the facts in this case, the trial court, in our opinion, did not abuse its discretion in receiving the evidence.

8. It is also claimed that the court unduly restricted cross-examination of the witness, Joseph Schwahn.   An examination of the record discloses that the assignment is without merit and that no rights of the defendant were invaded by the restriction of the cross-examination.

9. Error is also assigned upon a question asked a doctor (who testified as an expert witness) relating to the effect of arsenic administered in small doses.   The question related to a matter directly under consideration, which had been fully developed by the experts who testified on the subject.   The ruling in no manner prejudiced the defendant.

10. Error is assigned on remarks made by the trial court.   It is claimed that the remarks were improper, and that the statement of the law made by the court was not correct.

The remarks of the trial court were the result of a controversy between counsel for the defendant and for the state, during argument to the jury, over whether the defense could impeach a witness by con-

tradictory statements. The dispute arose over a controversy between counsel for the defendant and a witness for the state, in which they charged her with having made certain statements to them, which she denied.

Counsel for the state argued that counsel for the defendant did not dispute or impeach her denial. Counsel for the defendant objected to any reference being made to that controversy, because "the defense cannot impeach the witness on an immaterial issue."

The court said:

"If the matter was immaterial it should not have been asked. It was asked and it must be assumed that counsel for the defendant admitted it to be material. And that could be the only purpose of counsel for the defendant in asking the question. Counsel for the defendant would have the right, under the law, to go upon the stand and dispute the statement of the witness Mrs. Bobb; and counsel for the defendant having referred to the testimony in his argument to the jury, it is proper and right at this time that the counsel for the State may also refer to the same matter."

From a careful reading of the evidence on the subject, we are convinced that the court's statement was justified by the facts.

11. It is claimed that the special prosecuter made prejudicial remarks in his argument to the jury.

In their brief, counsel for the defendant say:

"It is unfortunate that the record does not contain the exact language used by counsel."

From this statement alone, the court would be justified in disregarding the error assigned. But aside from that, we have gone over the record carefully, and therefrom are unable to see where there is any reversible error in the remarks complained of, and especially so, in view of the admonition of the court.

The first objection questions counsel's right to say "that this is the first time, I ever heard that Joe Schwahn's reputation was bad."

To this objection, the court said:

"The statement, of course, of counsel, that this is the first time that he ever heard that Joseph Schwahn had a bad reputation is no part of the evidence, and therefore that statement of itself is not a part of the matter that goes to the jury to make up a verdict from. It is a

statement of counsel as to his own notion, which, of course, is not a matter of evidence here at all."

It is hardly conceivable that this statement could in any way have inflamed or excited the minds of the jurors, and, if it may be considered somewhat out of the record, in view of the prompt admonition of the court, no prejudice can be predicated thereon.

The second objection to the special prosecutor's argument, related to the statement that "Amelia Schneider died at four o'clock while the death certificate showed five o'clock in the morning."

The language used by the special prosecutor on this subject is not in the record. It simply appears in the objection of counsel for the defendant. Hence it ought to be disregarded. But we might say here that if the statement did appear as it is embodied in the objection, it could not be regarded as prejudicial.

While the state's exhibit 1 fixed the hour of death at five A. M., Dr. Lipp testified, that he arrived on the scene "between six and six thirty A. M.," and that at that time, according to his opinion deceased "had been dead perhaps two hours or so." Hence, on the facts alone, the objection is not well founded.

12. Error is assigned on the refusal to give requested instruction on circumstantial evidence. For the purposes of brevity, we will quote the first sentence only of this requested instruction, which reads:

"Gentlemen, I charge you further, that circumstantial evidence in a criminal case is of no value if the circumstances are consistent with either the hypothesis of innocence or the hypothesis of guilt, that it is not enough that the hypothesis of guilt will account for all of the facts proven, or that unless a verdict of guilty is returned, the evidence in the case will leave the crime shrouded in mystery."

The requested instruction was properly refused for various reasons, of which only two need be mentioned:

First, the instruction is confusing, ambiguous, vague, indefinite, and inexact.

Second, the instruction does not fit this case. It assumes that the evidence was purely circumstantial, when it was not. State v. Foster, 14 N. D. 561, 105 N. W. 938.

Finding no reversible error in the case, the order of the trial court,

denying defendant's motion for a new trial, ought to be affirmed. It is so ordered.

CHRISTIANSON, Ch. J., and BURKE and NUESSLE, JJ., and BERRY, Dist. J., concur.

BIRDZELL and JOHNSON, JJ., being disqualified, did not participate; Honorable M. J. ENGLERT, Judge of the First Judicial District and Honorable H. L. BERRY, Judge of the Sixth Judicial District, sitting in their stead.